William HOGUE, Plaintiff,

v.

Bill CLINTON, Governor of the State of Arkansas; Kenneth Whitlock; W.A. Tudor; Barrett Toan; Gail Huecker; Ray Scott and Curtis Ivery, in their capacity as employees of the Department of Human Services of the State of Arkansas; and Bud Rice and Gene Rainwater, individually, Defendants.

Civ. No. 83–2257.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

April 5, 1985.

Bob Scott and Tom Hinds, North Little Rock, Ark., for plaintiff.

E. Jeffery Story, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

Plaintiff, William Hogue, from September 1, 1962, until his termination on October 10, 1980, was employed by an agency of the State of Arkansas now known as the State Department of Human Services. For a number of years prior to his termination, Hogue was the director of the Scott County Office of Social Services located in Waldron, Arkansas. His office was responsible for administering a number of the social services provided by the agency, commonly known as "welfare."

During the summer of 1980, before the Democrat preferential primary had been held, Senator W.E. (Gene) Rainwater received from Bud Rice, a state representative from the Waldron area, a letter that he had received from Jackie and Edith Wright, grandparents of a minor child. The letter

was introduced as Defendants' Exhibit 7 and will be referred to as the "Wright" letter. The letter alleges certain wrongdoing in relation to the providing of certain welfare services to the mother of the minor child.

For some reason which is still unexplained, even though Senator Rainwater and Representative Rice testified, upon receipt of the letter by Rice from the Wrights, rather than handling the matter himself, he forwarded it to Senator Rainwater who, the evidence reflects, was locked in a political race which he later lost. Upon receipt of the Wright letter, Rainwater forwarded it to W.A. Tudor, a retired major with the Arkansas State Police who was then Director of Investigations-Medicaid Fraud.

After the letter was received by Tudor, he assigned Investigator Charles Milburn to investigate the allegations.

Since the letter had come from Senator Rainwater, Milburn, after first journeying to Waldron in a futile attempt to locate the Wrights, proceeded to Greenwood to discuss the matter with Senator Rainwater. Strangely, he was advised by Senator Rainwater that he knew nothing about the case and that he had simply received the letter from Representative Rice. Senator Rainwater apparently did not tell Milburn at the time that Rice was also a state legislator, but merely referred to him as the owner of a furniture store in Waldron.

Upon returning to Waldron, Milburn attempted to discuss the matter with Rice, but was advised by Rice that he knew nothing about the matter, and he referred him to Glenda Owens, an employee of the Waldron Social Services Office. During his testimony, Rice, when asked why he sent the letter to Rainwater, stated that he merely wanted to keep him advised. The court concludes that the circumstances in relation to the letter, and the "run-around" that Milburn received, lends credence to Hogue's contention that this matter was instituted by Rainwater because Rainwater believed that Hogue was supporting his opponent. That aspect of the case will be discussed in more detail below.

Still not knowing of Mr. Rice's position as a state legislator, Milburn used, for a brief period of time, Rice's business establishment as a headquarters out of which he conducted his investigation. He interviewed Glenda Owens, who claimed that Hogue was aware of the Wright situation and that numerous other instances of improper handling of claims had occurred in the Waldron office.

Milburn then interviewed Clyde Hawkins, one of the witnesses listed in the Wright letter. Hawkins was a former County Judge and Sheriff of Scott County, and he claimed that he was aware of irregularities in the running of the office in Waldron by Hogue.

At this point, Milburn reported to Tudor by telephone, and Milburn then learned for the first time that Rice was a state legislator. Tudor recognized the possible political implications of the investigation and directed that Milburn cease using the Rice business establishment as the base of his operations. He directed Milburn to return to Little Rock and the alleged irregularities were reported to Barrett Toan, Commissioner of the Division of Social Services of the Department of Human Services. The report to Toan was in writing, dated August 11, 1980, and was introduced as Defendants' Exhibit 8. In the report to Toan, allegations of numerous irregularities in the running of the Waldron office were reported. Among these were:

a. That Hogue certified clients for assistance that were not entitled to it, and directed other employees to do so;

b. That he allowed Peggy Keener, active in the campaign to elect Governor Bill Clinton, access to the confidential food stamp files, and provided her blank application forms for assistance and encouraged her to submit applications in behalf of persons in the county;

c. That Hogue instructed employees to certify, without question, all applica-

tions submitted by Ms. Keener, advising them that Ms. Keener had verified the information and that it was unnecessary for them to do so;

d. That he instructed AFDC clients not to turn in child support money until told to by him;

e. That he instructed employees to leave out of the applications certain information that would make the particular person applying ineligible for assistance, and modified and caused caseworkers to modify information submitted by clients so that they would be eligible for benefits;

f. He instructed caseworkers to certify every client that they see because he did not want any pending cases;

g. That he does not require verification to certify clients, and that, in some instances, the information was verified after the case had been certified;

h. That he was involved in politics in violation of the rules of the agency and of state law;

i. That he instructed certain employees to follow and surveil other employees and report to him in relation to their off-duty personal contacts;

j. That, during previous elections, several clients discussed with Clyde Hawkins, former County Judge and County Sheriff, Hogue's threat to them that if they did not vote Hogue's way, he would close their welfare cases;

k. That he instructed employees of the office to give clients more deductions than they were eligible for;

l. That he intimidated employees by telling them that he "had the Commissioner in his pocket."

After receiving the report, Toan directed that Tudor and his employees interview each employee and former employee of the Waldron office. In compliance with this order, Tudor prepared an outline for the investigators to use and each employee and former employee was interviewed. During the interview, investigators often identified themselves to the persons being interviewed as being with the Fraud Division, and it was general knowledge in the community that Hogue was under investigation for "fraud." During the course of the investigation, Hogue asked Tudor about the investigation, but he was not given any specifics in relation to the allegations.

After the interviews were completed, Tudor reported to Toan by a report dated August 25, 1980 (Defendants' Ex. 9). The cover letter to that report lists 19 alleged violations or irregularities in the running of the office, summarized as follows:

1. Instructs employees to violate policy to certify clients for assistance and issue food stamps.

2. Instructed AFDC clients to keep child support monies and utilize for other needs.

3. Interferes with the work of other agencies, causing some alienation.

4. Combining Social Service business with politics.

5. Demoralizing employees.

6. Utilizing office employees, state equipment and state materials in a political campaign.

7. Instructing the food stamp issuance officer to violate policy.

8. Instructing employee to utilize State time, equipment, and materials to prepare letters for private individuals.

9. Harassing an employee in front of the entire County Staff and visiting employees.

10. Instructing an employee to withhold a certain portion of service records requested by the Central Office.

11. Violation of policy during handling of child abuse incidents.

12. Committing conduct alienating other County Directors.

13. Violation of policy relative to foster homes.

14. Interfering with the ongoing investigation of Mr. Hogue's activities in Scott County.

15. Refusing to take action on possible fraudulent overpayments called to his attention.

16. Spends hours each week visiting in the office with Peggy Keener and permitting her free access to the entire building.

17. Permitting Peggy Keener access to the food stamp files.

18. Encouraging or threatening welfare clients to vote for Mr. Hogue's candidate.

19. Violating policy relative to voluntary medical travel.

The report describes the investigation conducted by Tudor's office in relation to each of these charges, and contains voluminous exhibits in relation thereto.

As a result of the investigation, by letter dated September 2, 1980, Commissioner Toan notified Hogue that he was terminated as of September 2, 1980. The letter describes, in general terms only, the allegations set forth in the August 25, 1980, report, and, again, gives Hogue no specific information in relation to the charges made.

By letter dated September 29, 1980 (Plaintiff's Ex. 17), Gail S. Huecker, Executive Director of the Arkansas Department of Human Services, advised Hogue that "I am overturning Commissioner Toan's decision on your termination of employment." The letter goes on to advise him that effective September 30, 1980, he was reinstated with back pay and placed on administrative leave pending further action. She advises that Commissioner Toan will have seven days "to make final determination as to whether action will be taken or he will place you back into active employment." The letter ends by advising Hogue that he is "guaranteed your due process rights will be protected during this determination period."

On approximately October 2, 1980, what was referred to by some of the state employees as a hearing was held in Toan's office with Hogue present. There was no record made and it is impossible to determine from the evidence adduced at the trial the nature of the meeting. The court is convinced that the meeting could not be considered to be a "hearing" in the sense that that word is used in relation to the protection of due process rights. Instead, the testimony indicates that Hogue was given the general allegations already referred to, with little, if any, specifics being made available to him, such as the names of the persons making the charges and the exact nature of the allegations made. He was told that every caseworker in his office had said, when interviewed, that he had told them to ignore standards for providing assistance to clients, but the specific allegations were not attributed to any particular employees. Kenny Whitlock, Director or Program Operations at the time, testified that he attended the meeting and that Hogue was not given the names of the clients involved, or the names of the employees complaining. He says that he was told of the nature of the charges, in general. Plaintiff's Exhibit 11 are notes which Whitlock used to conduct the meeting. There is dispute about whether these notes were made available to Hogue. Whitlock says that he does not know whether the notes were given to Hogue, and Debbie Nye, an attorney for Human Services, testified that Hogue did receive them. Hogue says that he did not. In any event, a mere reading of Plaintiff's Exhibit 11 shows that it, again, lists the allegations made in general terms only, and does not disclose sufficient information for Hogue to have refuted any of the charges made at this meeting. In this respect, Witness Nye testified that the names of the clients were not disclosed because that would reach the confidential relationship that was supposed to exist between clients and others. The court notes, in passing, that there was apparently no one present in the meeting who did not know or could not have determined the names of each and every client of the Waldron office. Be that as it may, it is apparent that the October 2, 1980, "meeting" was nothing more than that and was not a "hearing" in any reasonable sense of that word.

What was apparently intended to be a hearing was held on October 29, 1980, in the offices of Director Ray Robinson. The hearing was reported by a court reporter and the transcript of the hearing was received as Defendants' Exhibit 6. It becomes evident from a reading of this transcript that the hearing proceeded without Hogue or his attorney being provided with any information about the charges other than the general information described above. The hearing that was conducted is best described in Director Robinson's opening comments:

Okay. I have got this letter dated 1 October, by registered mail, from you, George Jernigan, stating that you are appealing Mr. Hogue's case when the Commissioner relieved him of his duties and claims that he gave him due process. From there, the only correspondence I have is from Barrett Toan to Mr. Hogue, dated 7 October, that did tell him he was relieved of his duties and a terminated employee of the Division of Social Services, and telling him that he had the right to appeal, which you, in your letter, have done. So, there. I'll leave it to you to start your case.

Mr. George Jernigan, Hogue's attorney at the hearing, then described in some detail his attempt to determine with some specificity the allegations made against his client. For example, Jernigan introduced a letter from his office dated September 5, 1980, addressed to Commissioner Toan, requesting, among other things, "statements, exhibits and evidence of any sort upon which Mr. Hogue's dismissal was based, and asking that he identify certain people who made statements upon which Commissioner Toan based his dismissal of Mr. Hogue in the broad, general statements." (P. 5 of transcript.) Then at p. 7 Jernigan stated that his client had been dismissed by Commissioner Toan "without any information as to the grounds or basis of his dismissal and without any opportunity to discuss the charges against him, and to present his side of the story without any information as to any specifics of any of the allegations against him."

In spite of these claims made by Hogue's attorney at the hearing, no attempt was made by either Director Robinson or the attorney representing the department, Debbie Nye, to inform Hogue, with any degree of specificity, the nature of the charges against him and the names of the persons making them. The hearing then consisted primarily of Jernigan introducing into the record various affidavits that had been prepared, with some questions asked of the persons who presented the affidavits. In addition, Hogue testified and during his testimony he stated unequivocally, under oath, that at no stage during the investigation was he provided with "any facts, any specifics, any statements, any specific evidence, as to why" he was being dismissed. He testified:

Q. As of today, 75 days after the investigation started, and 60 days after you were fired, have you seen one specific statement or any specific charges or any evidence as to why you have been dismissed?

A. No.

Although the Department of Human Services was represented by counsel, no attempt was made to refute in any way the allegations of Hogue that he had not been provided with the reasons for his dismissal other than in the broad general terms contained in the letters which are in evidence. After Hogue's testimony, Ms. Nye declined to call any witnesses, and the hearing was adjourned.

In a letter dated November 3, 1980 (Plaintiff's Ex. 18), Hogue was advised by Ray A. Robinson, Deputy Director, that "I will uphold Commissioner Toan's decision to terminate your employment and not reinstate back pay." The letter goes on to advise Hogue that if he did not agree with the decision made, he had "the right to appeal to the Arkansas Merit Council under their rules and regulations." The reference in the letter to the Arkansas Merit Council was in respect to an appeal procedure established for state employees by Act 693 of 1981 (Ark.Stat. Ann. §§ 12-3901

*et seq.*) (Supp.1983). From the date of Robinson's letter to February 9, 1981, the parties proceeded to prepare the matter for the hearing contemplated by Act 693. Plaintiff's Exhibits 13, 14 and 15 are examples of the prehearing matters that transpired.

When the parties and their attorneys appeared for the hearing on February 9, 1981, all agreed that it was inadvisable to hold the hearing because of a ruling by the Pulaski Circuit Court, Third Division, that Act 693 was unconstitutionally vague and unlawfully delegated legislative authority to the Arkansas Merit System Council Board established by the act. All agreed that the hearing would be delayed until the Arkansas Supreme Court acted in relation to that decision. On April 16, 1984, in the consolidated cases of *Patton, et al. v. Ragland* and *Charles v. Gordon, et al.*, 282 Ark. 231, 668 S.W.2d 3 (1984), the Arkansas Supreme Court affirmed the trial court's finding that the act was unconstitutional, and, for all practical purposes, the Arkansas Merit System Council Board and the appeals provided by the act to state employees were abolished.

By letter dated August 12, 1983, Hogue was advised by Curtis L. Ivery, then Commissioner of the Arkansas Department of Human Services, Division of Social Services, that, in effect, the termination of Hogue would not be reviewed and that the Division would not "take any further action regarding your termination." The letter advises Hogue that, in light of the recent court ruling, "your internal appeal of this matter is officially exhausted," and that if he desired to pursue the matter, "it seems that your only alternative is to initiate civil litigation." This suit was filed on September 9, 1983, alleging that plaintiff was deprived of both liberty and property without due process of law. The court has jurisdiction under the provisions of 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3) and (4).

The case was tried to the court on January 14 and 15, 1985. At the conclusion of the evidence, the court announced, on the record, that it would rule, based on the evidence that it had heard, that plaintiff was entitled to a due process hearing before his termination both because he had a property interest in his employment and because stigmatizing reasons were given during the course of his termination. The court took under advisement the question of whether Hogue's first amendment rights had been violated because, as he claimed, he was terminated because he refused to aid Senator Rainwater in his reelection campaign. The court asked for briefs from the attorneys on the issue of the remedy to be afforded Hogue. At that time, the court advised that it would make specific findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. The facts set forth in this opinion shall be considered the court's findings of fact.

Plaintiff alleged in his complaint, and contended at the trial, that:

a. He was terminated, in violation of his first amendment rights, because of his refusal to aid Senator Rainwater in his reelection campaign;

b. The reasons given for his termination at the time were stigmatizing and that, thus, he was denied liberty without due process of law in that he was not provided a name clearing hearing prior to his termination;

c. He was denied property without due process of law in that he had a property right to his job and was not provided a hearing prior to termination.

The court will discuss these issues in the order listed.

**Political Issue.**

There are three circumstances which are at least arguably applicable to this case in which the United States Supreme Court has found that a public employee is entitled to a hearing prior to termination. One of these is where the circumstances show that the employee was terminated because of his political association in violation of his free speech rights granted by the first amendment to the United States Constitu-

tion. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547, (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

As the court has already indicated, there is evidence from which a trier of fact could conclude that more than one of the "actors" in this controversy were "playing politics," at least to some extent. Based on the evidence adduced, the court believes that, more than likely, William Hogue, like many state employees in his position, especially in rural counties such as Scott County, at least on occasion, and perhaps more often, used his position to aid the political candidates of his choice. Likewise, it appears that, more than likely, Senator Rainwater and Representative Rice and other politicians in the county knew that this had occurred, but none of those individuals became particularly concerned about it until Rice and Rainwater, and probably other local politicians, came to believe that Hogue might be, in this particular election, supporting Patton, Rainwater's opponent—thus, the Wright letter. The court believes that it is significant that, although the Wright letter was apparently submitted to Representative Rice, he forwarded it to Senator Rainwater in Greenwood, several miles away. Attached to the letter introduced as Defendants' Exhibit 7 is the envelope in which the Wright letter was mailed to Mr. Tudor, and it contains Senator Rainwater's return address, with the Arkansas Senate designation and the seal of the state.

As already indicated, the court feels that it is "strange" to say the least that when Investigator Milburn contacted Rainwater, he professed to know nothing about the letter and sent Milburn back to Rice. Whereupon, Rice professed to know little if anything about it, and referred him to someone else. It is also significant, in the court's view, that Rainwater merely identified Rice as an owner of a furniture store in Waldron, and did not disclose to the investigator that he was also a state legislator.

In addition, the evidence indicates that Peggy Keener, active in the 1980 campaign of Governor Clinton, was given free access to the office and access to view and use records containing the names of persons receiving assistance and other confidential information. The implication is strong, and perhaps it is more than an implication, that this information was being used for political purposes. In addition, one or more of the persons interviewed by Tudor's staff claimed that Hogue and Keener used the office and office personnel to prepare and distribute certain purely political documents such as an invitation to a fish fry to be held to raise money in the political campaign in which Ms. Keener was interested.

However, even though the court believes that the evidence is ample from which it could find that several people were "playing politics" with the Waldron office, the court finds that, although the investigation was probably started because of a political feud, there is absolutely no basis for saying that Hogue was terminated because he refused to support any particular candidate or because of any other political association. The court was impressed with the testimony of Mr. Tudor and believes that he and his employees conducted a thorough, professional investigation not affected in any way by political considerations. He did his job, and in the court's view, did it well, and then turned the results of his investigation over to proper authorities.

Likewise, the court can find no evidence in the record that any of the persons who directly participated in Hogue's dismissal were impelled to any degree by political considerations.

■ In short, the court believes that, more than likely, the investigation was initiated by Rainwater and Rice, and other political figures in the county, through the furnishing of the Wright letter and other information, but that the persons conducting the investigation and responsible for the dismissal did not act for political rea-

sons. Thus, the court finds that plaintiff Hogue has failed to prove by a preponderance of the evidence that his first amendment rights to free speech were violated through a dismissal because of his political associations or refusal to aid a particular political candidate.

### Right to Name-Clearing Hearing.

■ Another circumstance in which the United States Supreme Court has held that a hearing is necessary before termination is where the circumstances of the dismissal are such that a "liberty interest" is violated. In order to fall within the prohibition of the due process clause, the employee must suffer some deprivation of liberty at the hands of the governmental employer other than loss of employment itself. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); and *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The Supreme Court has held that mere injury to reputation alone does not constitute a deprivation of liberty. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

■ However, where an employee is discharged under circumstances which created a stigma which forecloses freedom and ability to seek other employment, a hearing is necessary. In *Board of Regents v. Roth*, the Supreme Court seemed to say that where the employer publicly disseminates a charge against the employee which might seriously damage his standing and association in the community, a protected liberty interest may be triggered. *Roth, supra*, 408 U.S. at 573, 92 S.Ct. at 2707. In *Paul v. Davis, supra*, the Supreme Court seemed to narrow the rather broad language of *Roth* and *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In those cases, the court set forth the prerequisites of an actionable procedural due process violation. There must be "one" defamation, and "two" the defamation has to occur in the course of the termination of employment.

*Paul v. Davis, supra*, 424 U.S. at 710, 96 S.Ct. at 1164, and *Harnett v. Ulett*, 466 F.2d 113 (8th Cir.1972).

However, the Court of Appeals for the Eighth Circuit, the court whose decisions are binding on this court, has construed *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), in such a way that the mere failure to provide a due process hearing prior to termination may be actionable even if such hearing would have accomplished nothing because the charges were true and, thus, the terminated employees could not have cleared their names even if a name-clearing hearing had been afforded. In a case out of this court, *Pollock v. Baxter Manor Nursing Home*, 536 F.Supp. 673 (W.D.Ark.1982), this court found that although a name-clearing hearing was not provided the terminated employee, she was not harmed because the charges made at the time of her termination were true. A panel of the Court of Appeals for the Eighth Circuit, consisting of Judges Henley, Ross and McMillian, in 706 F.2d 236, affirmed; holding that "we agree that under the facts of this case, Pollock does not prevail because a liberty interest does not arise unless an employer disseminates a false and defamatory statement." Judge McMillian wrote a dissenting opinion in that phase of the case.

Then, on rehearing, 716 F.2d 545, the same panel, with Judge Henley dissenting, "changed its mind" and, essentially, adopted the position of Judge McMillian in his earlier dissenting opinion.

In that decision, at 546, the court of appeals framed the issue as follows:

A fundamental purpose of the due process clause is to allow the aggrieved party the opportunity to present his case and have its merits fairly judged. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 [102 S.Ct. 1148, 71 L.Ed.2d 265] (1982). Pollock was not given such an opportunity. Thus, the issue becomes whether Pollock is entitled to damages to remedy the lack of due process afforded her by the nursing home.

The court of appeals then answered the question that it asked:

> It is clear that the court in *Carey* determined that a plaintiff is still entitled to nominal damages for failure to hold a due process hearing even if it is shown that the stigmatizing information is true. In the instant case, the nursing home refused to conduct a due process hearing and thereby violated Pollock's right to procedural due process. We, accordingly, reverse the district court and order that Pollock be awarded nominal damages of $1.00 and reasonable attorney's fees.

■ Thus, the law in the Eighth Circuit appears to be that it is not really necessary that a party suing under section 1983 for the violation of a liberty interest show that he has been defamed. The court seemed to say in those opinions that if the reasons given are defamatory in nature if not true, and if the employee is not given an opportunity to rebut them, even though such hearing would be fruitless, he is still entitled to nominal damages and attorney's fees if he is not afforded the opportunity to futilely try to clear his name at a name-clearing hearing.

In this case, the court has no difficulty in determining from the evidence that Hogue was terminated for stigmatizing reasons. As indicated above, most everyone in Scott County knew that "fraud investigators" were investigating him and the operation by him of the Scott County office. In addition, a mere glance at the exhibits received in this trial indicates that Hogue's personnel file is replete with charges of wrongdoing. In addition, Mr. Tudor testified that he believed, as a result of the investigation, that there was enough evidence of violations of the law that he referred the matter to the Prosecuting Attorney for the county and delivered to him all of his investigative files.

■ Thus, there appears to be little question but that, during the course of Hogue's termination, stigmatizing reasons were given, and, thus, under the holdings discussed above, he was entitled to a due process hearing *before* his termination.

The court desires to make it abundantly clear that in so ruling the court has not, in any way, weighed the evidence as to the alleged wrongdoing of Hogue because the court does not believe that that is its "job." Instead, its function is to determined whether a hearing was necessary and, if so, whether an adequate one was provided. The evidence in relation to the charges made against Hogue are in great dispute, but it is clear that these charges were stigmatizing, requiring a hearing at which Hogue would have the opportunity to "clear his name." Whether the due process hearing required by the United States Constitution as interpreted by the Supreme Court in the cases discussed above was afforded Hogue will be discussed below.

**Property Right.**

■ The final circumstance arguably applicable to this case in which a hearing is required before termination is where the employee had a legally enforceable expectancy of employment either because of contract, express or implied, statute or ordinance, or by applicable personnel rules or regulations. The Policies And Procedures On Employee Grievance of the Department of Human Services was received as Defendants' Exhibit 2. Under the heading "Appeal of Termination" a specific procedure is set forth for an employee who believes he has been wrongfully terminated to follow. The lead sentence under this heading provides that an employee of the department "who feels he/she has been terminated unfairly will have the right to appeal, under the following formal procedure." Then, the procedure is set forth which culminated in an appeal before the Merit System Council discussed in more detail above. Thus, these provisions of the policies, especially when coupled with the provisions of Act 693 of 1981, clearly, in the court's view, provided the employees of that department with the sufficient expectancy of continued employment to require that a due process hearing be held before termination.

In this regard, it appears to be clear from the evidence that all parties concerned, during the process of the termination, believed that Hogue would be afforded a meaningful hearing before the Arkansas Merit System Council Board. As already indicated, the Arkansas Supreme Court declared the act creating that board to be unconstitutional and, for this reason, the hearing provided for by the act, and which all parties believe would be provided, was not provided. Thus, it appears clear that plaintiff Hogue had a property interest in his employment and that the state employer was, thus, required, to provide him a due process hearing *before* termination, and if such was not provided, the plaintiff was deprived of property without due process of law in violation of the fourteenth amendment to the United States Constitution.

### Due Process Hearing.

■ The United States Supreme Court has held that no particular form of procedure is required, but that certain elements must be present. *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). These include, at least (1) adequate notice, *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); (2) adequate opportunity for a hearing, *Armstrong v. Mango*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); (3) the right to introduce evidence, *Baltimore & Ohio Railroad Co. v. United States*, 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209 (1936); and (4) the right to confront and cross-examine witnesses, *Wolfe v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The court has already delineated above the deficiencies in the "hearings" which were provided to Hogue. It would not serve a useful purpose to reiterate those deficiencies. Suffice it to say that the only hearing that might even arguably have been sufficient was the one provided on October 29, 1980. But, for the reasons already discussed, that hearing was not meaningful in that the persons conducting it merely "threw the ball" to Hogue and his lawyer and said "it's your move," without providing them with any of the details necessary to provide a meaningful defense to the charges made. For a hearing to mean anything, and for an employee who is entitled to a due process hearing to have any chance to see that his rights are protected, he must know, at least in some detail, of the specifics of the charges made against him. He must know specifically what the charges are and who is making them so that he will have an opportunity to investigate the charges and rebut the allegations made by witnesses and other evidence. He must know what the person making the determination has on his mind and believes before he has any chance of convincing such person that the allegations made by others (unnamed) are not true. In fairness to all concerned in this matter, it appears obvious to the court that none of the parties believes that the meetings and hearing that were held were intended to be anything other than "going through the motions" so that a meaningful hearing could be held before the Arkansas Merit System Council Board at which witnesses could be subpoenaed and the case, in effect, tried. Unfortunately, as indicated, that board was in effect abolished by the Arkansas Supreme Court, but that fact in no way limits or removes the employer's obligation to provide a meaningful hearing providing the employee with the due process of law required by the United States Constitution.

In short, plaintiff Hogue was, under the cases discussed above, entitled to a due process hearing because both a liberty interest and a property interest were involved in his termination. He was not provided such hearing and is, thus, entitled to the remedies afforded by law.

### Remedy.

What remedy is this court required to provide? The court believes that question was answered in *Wellner v. Minnesota State Junior College Board*, 487 F.2d 153 (8th Cir.1973), the court whose decisions are binding on this one. In that case, the district court held that a fired teacher of a junior college was entitled to a name-clearing hearing and did not receive one at the

time of his termination. However, the court further held that a hearing, at that late date, would accomplish nothing, and refused to order one. In reversing in part, the court of appeals stated:

> Wellner was improperly discharged because he was not accorded an appropriate hearing. His termination was therefore a nullity and he remains on the payroll until a proper hearing is held, at which time he may be retained or not reappointed. It is not within our province to speculate that after a proper hearing clearing his reputation the Board will recommend that Wellner not be reappointed, or that the appropriate official will not reappoint him to a similar teaching position. In any event, Wellner remains on the payroll and is entitled to receive the wages he will have earned until his name is cleared by proper Board action and the decision is properly made with respect to whether he will be reappointed. However, any award shall be reduced by interim earnings he may have derived from other employment.

■ Thus, as the court understands the holding in the *Wellner* case, *supra,* it must find, and does find, that Hogue shall be considered, for salary and fringe benefit purposes at least, to have been an employee of the Arkansas Department of Human Services from the time of his termination until he either is reappointed or discharged after the hearing required by law is afforded him.

■ Plaintiff prayed for compensatory damages in the amount of $1,000,000.00 and for punitive damages of the same amount. The court finds that the plaintiff has failed to meet his burden of proving any damage other than the damages caused by the loss of his job and the salary and fringe benefits flowing therefrom.

The court should make it abundantly clear that it has not attempted to weigh the evidence in this case and determine who is "right" and who is "wrong." In this respect, there is ample evidence in the record from which the person conducting the due process hearing required by law could find

that many of the charges made against Hogue were true, and that he should not retain his job. On the other hand, there is evidence from which that person might conclude to the contrary. The court, by this decision, does not intend to say, or even intimate, what decision should be reached after the due process hearing is afforded. At such time, as *Wellner* points out, he may be retained or not reappointed and the employer may, at least as far as federal courts are concerned, decline to reappoint or retain him for any reason not prohibited by the United States Constitution or federal law. This court, and no other federal court, has the right to insure that the decision made after a proper hearing is "the right one." Instead, our only function in a case such as this is to insure that a meaningful due process hearing is afforded the employee before a liberty interest or a property interest is affected by the termination decision.

A separate judgment in accordance with this memorandum opinion will be concurrently entered.