791 F.2d 1318
 1 Indiv.Empl.Rts.Cas. 1346
 William HOGUE, Appellee,
v.
Bill CLINTON, Governor of State of Arkansas; Kenneth
Whitlock; Barrett Toan; Gail Huecker; Ray Scott and
Curtis Ivery, in their capacity as employees of the
Department of Human Services of the State of Arkansas, Appellants.
 No. 85-1573.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 15, 1986.
Decided May 27, 1986.
Rehearing Denied July 15, 1986.
 
 E. Jeffrey Story, Asst. Atty. Gen., Little Rock, Ark., for appellants.
 Bob Scott, North Little Rock, Ark., for appellee.
 Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ROSS, Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Appellants in this case, the Governor of the State of Arkansas and various other present or former state employees, appeal from the district court's entry of judgment in favor of the plaintiff below, appellee William Hogue. Hogue alleged in his complaint that his discharge from his position as Director of the Scott County Office of the Arkansas Department of Human Services, Division of Social Services, deprived him of property and liberty in violation of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. Sec. 1983. The district court held that Hogue had been deprived of both liberty and property interests without due process, and ordered that Hogue be considered to have remained an employee of the Department of Human Services for salary and fringe benefit purposes until he was provided a proper hearing. Hogue v. Clinton, 605 F.Supp. 1288 (W.D.Ark.1985). We reverse outright the district court's judgment that Hogue had a property interest in continued employment. We also reverse the district court's holding as to Hogue's liberty interest, and remand for a determination of whether Hogue established the prerequisites for entitlement to a name clearing hearing.
 
 I. FACTS
 
 2
 The facts surrounding Hogue's termination from his position with the Arkansas Department of Human Services are set forth in detail in Hogue, 605 F.Supp. 1289-94, and will be stated more briefly here. Hogue had been employed with the State Department of Human Services, an agency of the State of Arkansas, since 1962. For several years prior to his discharge Hogue was the Director of the Scott County Office of Social Services in Waldron, Arkansas (Scott County Office). The Scott County Office was responsible for administering several social services, including Medicaid, food stamps, and Aid to Families with Dependent Children (AFDC). Because of complaints received about services provided by the Scott County Office, an investigation was begun into Hogue's administration of the office. After this preliminary investigation was conducted, a report listing alleged irregularities in Hogue's running of the Scott County Office was submitted to Barrett Toan, then Commissioner of the Division of Social Services.[1]
 
 
 3
 Upon receiving the report, Commissioner Toan directed the investigators to interview past and present employees of the Scott County Office to identify those cases in which misconduct had occurred. After these interviews were completed, the chief investigator submitted a report dated August 25, 1980 to Toan, listing nineteen alleged violations or irregularities in the running of the office.[2] Toan reviewed this report, came to the decision to terminate Hogue, and so notified Hogue by letter of September 2, 1980. The letter sent by Toan to Hogue describes in general terms the allegations in the August 25th report, but gives no specific information as to these charges.
 
 
 4
 On September 16, 1980, Hogue appealed his termination to Gail Huecker, Executive Director of the Department of Human Services, pursuant to the Department's grievance procedure. Huecker responded by letter dated September 29, 1980 that she was overturning Toan's decision to terminate Hogue, reinstating him with back pay, and placing him on administrative leave. Huecker gave Commissioner Toan seven days to determine whether further action would be taken against Hogue. On October 2, 1980 a meeting was held in Toan's office, with Toan, Hogue, Hogue's attorney Mr. George Jernigan, Kenny Whitlock, Director of Program Operations, and Debby Nye, an attorney for Human Services, all present. The allegations against Hogue apparently were discussed at this meeting, although as the district court noted no record was made of the meeting.
 
 
 5
 Following this meeting, on October 7, 1980, Toan once again wrote Hogue, advising him that he was being terminated from employment effective October 10, 1980. Hogue appealed a second time to Huecker, and a second meeting was held on October 29, 1980 in the offices of Ray Robinson, Deputy Director of Human Services, who presided in Huecker's absence. A few days after this meeting, on November 3, Mr. Robinson informed Hogue that he had determined to uphold Toan's decision to terminate Hogue without reinstating back pay. Robinson also advised Hogue that he had the right to appeal to the Arkansas Merit Council, a then-existing appeal procedure established for state employees by Act 693 of 1981 (Ark.Stat.Ann. Secs. 12-3901 et seq.) (Supp.1983). Although the parties scheduled a hearing before the Council, it was never held because a state trial court held Act 693 unconstitutional, a holding later affirmed by the Arkansas Supreme Court. Patton v. Ragland, 228 Ark. 231, 668 S.W.2d 3 (1984). Because the practical effect of the state courts' decisions in Patton was to abolish the Arkansas Merit System Council Board, Hogue was advised in August 1983 by Curtis L. Ivery, then Commissioner of the Arkansas Department of Human Services, that his internal appeal of the termination was exhausted and that his only alternative was to initiate civil litigation.
 
 
 6
 Hogue filed the present action on September 9, 1983.[3] The case was tried to the court on January 14 and 15, 1985, with the court rendering its decision on April 5, 1985. The court determined that because stigmatizing reasons were given in the course of his termination, Hogue was entitled to a due process hearing before his termination. Hogue, 605 F.Supp. at 1297. The court also found that Hogue had not received the name clearing hearing which he was due prior to his termination. Id. at 1298. Further, the district court held that Hogue had a "legally enforceable expectancy of employment" also sufficient to require a due process hearing before his termination. Id. at 1297. The court based its finding on the provisions of The Policies and Procedures on Employee Grievance of the Department of Human Services [Grievance Policies and Procedures] as well as the provisions of Act 693 of 1981. The court explained its finding as follows:
 
 
 7
 Under the heading "Appeal of Termination" [in the Grievance Policies and Procedures] a specific procedure is set forth for an employee who believes he has been wrongfully terminated to follow. The lead sentence under this heading provides that an employee of the department "who feels he/she has been terminated unfairly will have the right to appeal, under the following formal procedure." Then, the procedure is set forth which culminated in an appeal before the Merit System Council * * * * Thus, these provisions of the policies, especially when coupled with the provisions of Act 693 of 1981, clearly, in the court's view, provided the employees of that department with the sufficient expectancy of continued employment to require that a due process hearing be held before termination.
 
 
 8
 Id. The court additionally found that Hogue had been deprived of this property right without due process because he was never provided a meaningful hearing. Those hearings which did take place on October 2 and 29, 1980 were deficient, in the court's view, in that Hogue was given neither the specifics of the charges against him, nor the opportunity to refute those charges. Id. at 1292-93, 1298.
 
 II. LIBERTY INTEREST
 
 9
 Appellants claim that the district court erred in concluding that Hogue had been deprived of a liberty interest without due process because he did not receive a pretermination name clearing hearing. In particular, appellants cite Seal v. Pryor, 670 F.2d 96, 99 (8th Cir.1982), in support of their claim that Hogue was not entitled to such a hearing because he failed to prove that the stigmatizing information was false and that appellants made the information public. The district court noted, however, that since Seal v. Pryor this court has construed the Supreme Court's holding in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), to entitle a plaintiff to nominal damages for a failure to hold a due process hearing prior to termination even if the charges were true. Hogue, 605 F.Supp. at 1296-97; see also Pollock v. Baxter Manor Nursing Home, 716 F.2d 545, 547 (8th Cir.1983) (per curiam) (Pollock II ).[4] In Payne v. Ballard, 761 F.2d 491, 493 (8th Cir.1985), this court stated that for the plaintiff to establish a liberty interest, "he must show that the reasons for discharge stigmatized him and that the defendants made the reasons public."
 
 
 10
 In this case, the district court found that Hogue was terminated for stigmatizing reasons, Hogue, 605 F.Supp. at 1297, a finding we conclude not to be clearly erroneous in light of the serious nature of the charges of misconduct against him.[5] The court, however, did not expressly find that the appellants made the charges against Hogue public.[6] Although it may be inferred that some dissemination had occurred from the court's statement that "most everyone in Scott County knew that 'fraud investigators' were investigating [Hogue]," the court made no finding as to whether apellants were responsible for any dissemination that occurred. Because a finding of publication is a prerequisite to demonstrating a liberty interest, see Payne, 761 F.2d at 493, we remand to the district court for determination of whether appellants publicly disseminated the charges against Hogue.[7] Should the court find that the appellants did publicize stigmatizing charges, Hogue will have established that he possessed a right to a pretermination name clearing hearing. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The court should then determine truth or falsity of the charges against Hogue and award an appropriate remedy. Proof of a violation of his right to procedural due process will entitle Hogue to at least nominal damages and attorney fees, see Pollock II, 716 F.2d at 547, under the "Lawyer's Relief Act." See Pollock II, 716 F.2d at 549 (Henley, J., dissenting). Actual damages such as back pay, however, will be awarded only if Hogue can prove actual injury. Bishop v. Tice, 622 F.2d 349, 357-58 n. 17 (8th Cir.1980). Unless Hogue can establish that he suffered actual injury due to the failure to hold a pretermination name clearing hearing, we think an award of anything but nominal damages would be a windfall, not compensation. See Carey v. Piphus, 435 U.S. at 260, 98 S.Ct. at 1050.[8] We therefore direct the district court that if Hogue does establish that his right to a pretermination hearing was violated, he should not be awarded back pay prior to the district court's hearing, and should be awarded only nominal damages and attorney fees by the court unless he proves actual injury.
 
 III. PROPERTY INTEREST
 
 11
 Appellants claim next that the court erred in holding that Hogue possessed a property interest in his employment entitling him to a pretermination due process hearing. Specifically, appellants assert that the district court failed to look to Arkansas state law to determine whether Hogue actually had a property right in employment, and that the court erred in holding that the Grievance Policies and Procedures along with Act 693 of 1981 secured such a right for Hogue. We agree with appellants that the court erred in determining that Hogue possessed a property interest in continued employment.
 
 
 12
 The Supreme Court stated in Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), that: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." In Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976), the Court stated that "[t]he sufficiency of the claim of entitlement must be decided by reference to state law." In Arkansas an employee is generally terminable at will in the absence of an employment contract for a fixed term. Griffin v. Erickson, 277 Ark. 433, 436, 642 S.W.2d 308, 310 (Ark.1982). That the employment is public rather than private does not alter the "at will" status of the employment, nor does a provision in the employment contract that an employee will not be discharged except for good cause. Id.[9]
 
 
 13
 The district court ignored the Arkansas "employment at will" doctrine, instead looking to the Grievance Policies and Procedures. We disagree with the district court that the Grievance Policies and Procedures, coupled with the provisions of Act 693 of 1981 providing an appeal before the Merit System Council, conferred a "sufficient expectancy of continued employment" upon Hogue to require a pretermination due process hearing. Grievance procedures that do not establish any grounds upon which termination must be based do not in themselves create a property interest in employment. Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983). See also Cato v. Collins, 539 F.2d 656, 660-61 (8th Cir.1976) (Arkansas statutes outlining procedures, including the right to a hearing, for terminating a teacher's employment create no expectancy of continued employment). As the Ninth Circuit has stated:
 
 
 14
 Procedural requirements ordinarily do not transform a unilateral expectation into a constitutionally protected property interest. A constitutionally protected interest has been created only if the procedural requirements are intended to be a "significant substantive restriction" on the * * * decision making. If the procedures required impose no significant limitation on the discretion of the decision maker, the expectation of a specific decision is not enhanced enough to establish a constitutionally protected interest in the procedures.
 
 
 15
 Goodisman v. Lytle, 724 F.2d 818, 820 (9th Cir.1984) (citations omitted). See also Clemente v. United States, 766 F.2d 1358, 1364-65 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986) and cases cited therein. Cf. Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (state prison regulations governing administrative segregation of inmates create protected liberty interest through use of language mandating that such segregation will not occur absent "specified substantive predicates"); Olim v. Wakinekona, 461 U.S. 238, 249-50, 103 S.Ct. 1741, 1747-48, 75 L.Ed.2d 813 (1983) (state prison regulations' lack of substantive limitation on official discretion creates no protected liberty interest on part of inmates).
 
 
 16
 Here, the Grievance Policies and Procedures merely provide an avenue of appeal for an employee discharged from the Department of Human Services; they do not restrict or even guide that agency's decision making by allowing for termination only under certain circumstances or for specific reasons.[10] The dissenting opinion reads into the phrase in the Grievance Policies and Procedures stating that an employee "who feels he/she has been terminated unfairly will have the right to appeal, under the following formal procedures" a requirement that an employee can be terminated only for good cause. We disagree that this provision in the Grievance Policies and Procedures "may be properly construed to impose substantive restraints on the decision to terminate." The provision creates only an expectancy of review, not of continued employment; the procedures outlined place no significant substantive restrictions on the decision-making. Under Arkansas law, because he was not employed for a definite term, Hogue was an employee at will, subject to dismissal at any time without cause. We do not see, then, how Hogue could have harbored anything more than a unilateral expectation of continued employment, insufficient to entitle him to due process protection. Roth, 408 U.S. at 577, 92 S.Ct. at 2709. We therefore reverse the district court's holding that Hogue possessed a property interest in his employment entitling him to due process before he was terminated.
 
 IV. CONCLUSION
 
 17
 That part of the district court's judgment holding that Hogue possessed a property interest in his employment is reversed. That part of the district court's judgment holding that Hogue was entitled to a name clearing hearing because his liberty interest was violated is reversed and remanded for a determination of whether the stigmatizing reasons given during the course of his termination were publicly disseminated by appellants. If the district court finds that appellants did publicize the charges, the court should then determine the truth or falsity of the charges. Should the stigmatizing reasons against Hogue be determined to be true, Hogue will not be entitled to actual damages or reinstatement, but only nominal damages and attorneys fees.
 
 
 18
 LAY, Chief Judge, concurring in part and dissenting in part.
 
 
 19
 I respectfully dissent from the majority's holding that Hogue had no property interest in his employment under Arkansas law. I also write separately to clarify what I view as the limits of the majority's holding on the measure of Hogue's damages.
 
 Property interest
 
 20
 I have great difficulty in rationalizing that a seventeen year employment tenure with the State of Arkansas, protected by a state grievance procedure, fails to provide an employee with a sufficient expectancy of continued employment to invoke the requirements of the due process clause. There is no dispute that the existence of a property interest, or "a legitimate claim of entitlement," Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), in state employment is to be determined by state law. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). As the majority opinion points out, the traditional rule in Arkansas is that an employee is generally terminable at will when the term of employment is indefinite. See Griffin v. Erickson, 277 Ark. 433, 436-37, 642 S.W.2d 308, 310 (1982). Further, the majority makes clear that the Arkansas Supreme Court has never squarely declared its "employment at will" doctrine legally defunct. However, the state court has, in three recent opinions, declined to squarely apply the doctrine.[1] In the most recent of these cases, the Arkansas court declared "[w]e have clearly stated that we will reexamine our doctrine when we are presented with a case in which the contract of employment provides for discharge only for cause and the employee is discharged arbitrarily or in bad faith." Gaulden v. Emerson Electric Co., 284 Ark. 149, 152, 680 S.W.2d 92, 94 (1984) (emphasis added).[2] Indeed, in Jackson v. Kinark Corp., 282 Ark. 548, 669 S.W.2d 898 (1984), the court reversed a summary judgment in favor of the employer based on the traditional rule, so that the facts could be developed on whether an employee handbook created a contract of employment giving rise to a cause of action for wrongful discharge. Given the express language in Gaulden that the court will reexamine the issue, and the court's disposition in Jackson, it would seem clear that the Arkansas Supreme Court would hold that a contract of employment prohibiting discharge except for good cause creates an enforceable contract right in the employee, and thus an enforceable property interest, that the employee will not be discharged except for cause. In matters such as this we must decide state law in the same manner as the Arkansas Supreme Court would. In the alternative, although I feel that the state certification procedure should be used rarely by a federal appellate court,[3] any doubts on this issue would better be resolved by certifying the issue to the state supreme court for decision rather than by denying a seventeen year employee his livelihood by speculating about what state law might be.
 
 
 21
 Further, it seems clear that the "Policies and Procedures on Employee Grievance of the Department of Human Services" creates such a contract between Hogue and his employers. The grievance procedure states that an employee "who feels he/she has been terminated unfairly will have the right to appeal, under the following formal procedure." This provision may be properly construed to impose substantive restraints on the decision to terminate.[4] The term "unfair" in the employment context lends itself to an ordinary meaning of "without good cause." Thus, the appeal procedure here should be interpreted to both create a contract between Hogue and his employer that he will not be terminated except for cause, and to transform a "mere procedure" into a substantive expectancy. I would therefore affirm the district court's conclusion[5] that Hogue had a property interest in his job and hold that, if pretermination procedures were lacking, he is entitled to damages until such time as a proper hearing is held. The proper measure of those damages is the issue to which I now turn.
 
 Measure of damages
 
 22
 I agree with the majority's precise holding on the damages available to Hogue if he proves that the manner of his termination deprived him of liberty. As the majority points out, under Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), an employee alleging that a discharge deprived him or her of liberty may recover only nominal damages, unless it can be shown that a pretermination hearing would have changed the result or the plaintiff can prove actual damages such as emotional distress.[6] At issue in Carey was the measure of damages to be awarded two students who had been suspended from school without the benefit of presuspension procedures. The Court concurred in the court of appeals' holding that "if [the school officials] can prove on remand that '[the students] would have been suspended even if a proper hearing had been held' then [the students] will not be entitled to recover damages to compensate them for injuries caused by the suspensions." Carey, 435 U.S. at 260, 98 S.Ct. at 1050 (quoting Piphus v. Carey, 545 F.2d 30, 32 (7th Cir.1976)). Moreover, the Court held that, absent proof of actual injury, the students could recover only nominal damages for the violation of their due process rights per se. Carey, 435 U.S. at 262-64, 98 S.Ct. at 1051-52. The Court rejected the students' argument analogizing the deprivation of procedural due process to defamation per se, in which the plaintiff need not produce evidence of actual injury since substantial damage is presumed to occur. Id.
 
 
 23
 As the Court also acknowledged in Carey, the proper measure of damages for a constitutional wrong must be evaluated against the nature of the particular constitutional right in question. Carey, 435 U.S. at 264-65, 98 S.Ct. at 1052-53. "[T]he elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another." Id. Thus, an analysis of the reach of the Carey damage rules must take into account the nature of the constitutional injury sustained by the suspended students.
 
 
 24
 The Court in Carey does not clearly state whether the interest implicated by the students' suspensions was a liberty or property interest; school suspensions are apparently treated as a hybrid of the two. Compare Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975) (viewing suspensions as a deprivation of property) with id. at 574-75, 95 S.Ct. at 736-37 (liberty interest implicated); see Paul v. Davis, 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). What does seem clear, though, is that the injury inflicted by a short school suspension is more in the nature of a deprivation of liberty than property; that is, more akin to an infliction of a stigma than a deprivation of a continued entitlement to a state benefit. A brief suspension, like a short illness, does little to impair the overall value of a student's education. The principal harm to a student arising from a short suspension lies in the possibility that the student's teachers may begin to view and treat the student as a troublemaker. Thus, the students' attempt in Carey to analogize their damages to those applicable to defamation seems entirely appropriate.
 
 
 25
 By contrast, expulsion from school, or having the schoolhouse door barred entirely, imposes no less a stigma but also disparages a student's fundamental entitlement to a state-provided benefit, namely, education itself. See Plyler v. Doe, 457 U.S. 202, 223, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) (barring class of students from free public education imposes a "lifetime hardship," "stigma of illiteracy will mark [children] for the rest of their lives"). In such a case, the full panoply of injunctive relief, including school enrollment of students by preliminary injunction pending the outcome of litigation, has properly been awarded. See Plyler v. Doe, 458 F.Supp. 569, 575 (E.D.Tex.1978).
 
 
 26
 The same distinction between liberty and property interests controls the remedies available to public employees who are discharged in violation of procedural due process. When, as here, insufficient predeprivation procedures result in an alleged invasion of protected liberty interests, the Carey damage rules apply. When, however, procedural due process is violated such that an employee's property interest in employment is invaded, Carey is inapposite and an employee should be entitled to equitable relief in the amount of backpay consistent with our holding in Wellner v. Minnesota State Junior College Board, 487 F.2d 153, 157 (8th Cir.1973). Drawing such a distinction between liberty and property interests for purposes of determining the appropriate remedy is not mere sophistical logic chopping. A name-clearing hearing and a "cause" hearing perform quite different functions and describe quite different constitutional claims. In a name-clearing case, there is generally no issue that the employee could have been discharged for any reason; rather, at issue is whether the reasons publicized for the discharge were stigmatizing and false. See generally Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). Thus, in any event the employee had no constitutional entitlement to the job itself, but only to the retention of his or her good name for purposes of seeking reemployment. See Roth, 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12 (once name-clearing hearing is held employer may remain free to deny employment). The proper measure of damages for a name-clearing case thus focuses on proven harm to the reputation, not loss of the job. See Owen v. City of Independence, 560 F.2d 925, 939-40 (8th Cir.1977), rev'd on other grounds, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). By contrast, a "cause" hearing centers on whether the employee has a continued claim to the job itself. Since an employee alleging a deprivation of property is at bottom urging his or her entitlement to continued employment, the measure of damages should thus focus on the value of the job, not the value of the employee's reputation or other measure of actual damage.
 
 
 27
 There is language in Carey that suggests that the Court might not have recognized this distinction at the time Carey was decided. At footnote 15 of the Carey decision, the Court notes with disfavor several cases from the fourth and fifth circuits that awarded a backpay measure of damages for public employees discharged for cause but without procedural due process. Carey, 435 U.S. at 260 n. 15, 98 S.Ct. at 1050 n. 15. This language is dicta only, and seemingly is put to rest by Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).[7] The unequivocal message of Loudermill is that due process "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interests in his [or her] employment." Loudermill, 105 S.Ct. at 1493 quoting Roth, 408 U.S. at 569-70, 92 S.Ct. at 2705. This rule clearly imposes on public employers an obligation to retain an employee on the payroll until a pretermination hearing satisfying the Loudermill notice and hearing requirement is conducted.[8] Significantly, the Court observed "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay." Loudermill, 105 S.Ct. at 1495 (footnote omitted, emphasis added).[9] To effectively bar recovery of back pay damages by the application of the Carey rules would make a mockery of the requirement of a pretermination hearing since, without the deterrent of a back pay award, no incentive remains for the employer to do anything more than provide only a post-termination hearing.[10]
 
 
 28
 In fashioning remedies for constitutional harms, we are charged with the fundamental obligation and responsibility of protecting constitutional rights. In another context, the Court has stated that "[a] damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees." Owen v. City of Independence, 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980) (municipalities not entitled to qualified immunity defense). The Court in Owen quoted with approval our decision in United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir.1973), where we stated that the reasonably certain prospect of back pay awards "provide[s] the spur or catalyst which causes employers * * * to self-examine and to self-evaluate their employment practices." Id. at 379, quoted in Owen, 445 U.S. at 652 n. 35, 100 S.Ct. at 1416 n. 35. Loudermill requires no less. I would thus hold that an employee who proves a property deprivation based on having been terminated without a Loudermill pretermination hearing be awarded back pay from the time of discharge until a proper hearing is held.
 
 
 
 [1]
 The following charges were among those listed in the report submitted to Toan:
 a. That Hogue certified clients for assistance that were not entitled to it, and directed other employees to do so;
 b. That he allowed Peggy Keener, active in the campaign to elect Governor Bill Clinton, access to the confidential food stamp files, and provided her blank application forms for assistance and encouraged her to submit applications in behalf of persons in the county;
 c. That Hogue instructed employees to certify, without question, all applications submitted by Ms. Keener, advising them that Ms. Keener had verified information and that it was unnecessary for them to do so;
 d. That he instructed AFDC clients not to turn in child support money until told to by him;
 e. That he instructed employees to leave out of the applications certain information that would make the particular person applying ineligible for assistance, and modified and caused caseworkers to modify information submitted by clients so that they would be eligible for benefits;
 f. He instructed caseworkers to certify every client that they see because he did not want any pending cases;
 g. That he does not require verification to certify clients, and that, in some instances, the information was verified after the case had been certified;
 h. That he was involved in politics in violation of the rules of the agency and of state law;
 i. That he instructed certain employees to follow and surveil other employees and report to him in relation to their off-duty personal contacts;
 j. That, during previous elections, several clients discussed with Clyde Hawkins, former County Judge and County Sheriff, Hogue's threat to them that if they did not vote Hogue's way, he would close their welfare cases;
 k. That he instructed employees of the office to give clients more deductions than they were eligible for;
 l. That he intimidated employees by telling them that he "had the Commissioner in his pocket."
 
 
 [605]
 F.Supp. at 1290-91
 
 
 [2]
 The nineteen charges concerning Hogue's conduct listed in the report are as follows:
 
 
 [1]
 Instructs employees to violate policy to certify clients for assistance and issue food stamps
 
 
 [2]
 Instructed AFDC clients to keep child support monies and utilize for other needs
 
 
 [3]
 Interferes with the work of other agencies, causing some alienation
 
 
 [4]
 Combining Social Service business with politics
 
 
 [5]
 Demoralizing employees
 
 
 [6]
 Utilizing office employees, state equipment and state materials in a political campaign
 
 
 [7]
 Instructing the food stamp issuance officer to violate policy
 
 
 [8]
 Instructing employee to utilize State time, equipment, and materials to prepare letters for private individuals
 
 
 [9]
 Harassing an employee in front of the entire County Staff and visiting employees
 
 
 [10]
 Instructing an employee to withhold a certain portion of service records requested by the Central Office
 
 
 [11]
 Violation of policy during handling of child abuse incidents
 
 
 [12]
 Committing conduct alienating other County Directors
 
 
 [13]
 Violation of policy relative to foster homes
 
 
 [14]
 Interfering with the ongoing investigation of Mr. Hogue's activities in Scott County
 
 
 [15]
 Refusing to take action on possible fraudulent overpayments called to his attention
 
 
 [16]
 Spends hours each week visiting in office with Peggy Keener and permitting her free access to the entire building
 
 
 [17]
 Permitting Peggy Keener access to food stamp files
 
 
 [18]
 Encouraging or threatening welfare clients to vote for Mr. Hogue's candidate
 
 
 [19]
 Violating policy relative to voluntary medical travel
 
 
 [605]
 F.Supp. at 1291-92
 
 
 [3]
 In addition to claiming deprivation of his Fourteenth Amendment rights to liberty and property, Hogue also alleged in his complaint that he was terminated in violation of his First Amendment rights because of his refusal to aid Senator Rainwater in his reelection campaign. The district court found no basis for Hogue's argument that he was dismissed in violation of his First Amendment rights; this finding is not challenged on appeal
 
 
 [4]
 The court's opinion in Pollock II, reversing the district court's dismissal of the plaintiff's action, came on rehearing of the appeal after the original panel opinion was filed in Pollock v. Baxter Manor Nursing Home, 706 F.2d 236 (8th Cir.1983) (per curiam) (Pollock I ). In Pollock I, the panel affirmed the district court's dismissal of the plaintiff's action, with a dissent from Judge McMillian. In his dissent in Pollock I, Judge McMillian stated that the court's holding in Seal v. Pryor (which Judge McMillian authored), that the plaintiff had to prove that the stigmatizing information was false to establish a liberty interest, was "premised upon the fact that the public employee did not deny the substantial truth of the charges that led to his dismissal." Pollock I, 706 F.2d at 240. Judge McMillian discussed the Supreme Court's holding in Carey v. Piphus, which he stated "stands for the proposition that a plaintiff may recover nominal damages for [a] constitutional deprivation in and of itself." Id. at 238. Judge McMillian also quoted the Court's statement in Carey that:
 Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury. Id. at 240 (quoting Carey v. Piphus, 435 U.S. at 266, 98 S.Ct. at 1053 (citations omitted)).
 Based in part on this language in Carey, Judge McMillian concluded that a discharged public employee is not required to prove that the Government's stigmatizing charges are false to establish a liberty interest, but need only deny the substantial truth of such charges. Id. The reasoning of Judge McMillian's dissent in Pollock I as to the impact of Carey v. Piphus on the need for a plaintiff to establish falsity was adopted in the majority opinion in Pollock II, 716 F.2d at 547, with Judge Henley dissenting. In the instant case, Hogue does allege that the charges against him were false.
 
 
 [5]
 See supra notes 1 and 2
 
 
 [6]
 In regard to whether Hogue had established a right to a name clearing hearing the court found as follows:
 In this case, the court has no difficulty in determining from the evidence that Hogue was terminated for stigmatizing reasons. As indicated above, most everyone in Scott County knew that "fraud investigators" were investigating him and the operation by him of the Scott County Office. In addition, a mere glance at the exhibits received in this trial indicates that Hogue's personnel file is replete with wrongdoing. In addition, Mr. Tudor testified that he believed, as a result of the investigation, that there was enough evidence of violations of the law, that he referred the matter to the Prosecuting Attorney for the county and delivered to him all of his investigative files.
 Thus, there appears to be little question but that, during the course of Hogue's termination, stigmatizing reasons were given, and, thus * * * he was entitled to a due process hearing before his termination.
 
 
 [605]
 F.Supp. at 1297 (emphasis in original)
 
 
 [7]
 Of the three types of publication that the district court inferred took place here in its statement quoted supra note 6, only one is potentially sufficient to satisfy the publication requirement. That "most everyone in Scott County knew that 'fraud investigators' were investigating" Hogue does not establish that the defendants publicized the reasons for Hogue's discharge. Rather, this fact establishes only that the public knew about the investigation of Hogue; for all the public knew, Hogue could have been terminated for non-stigmatizing reasons. Also, that the charges against Hogue were referred to the county Prosecuting Attorney does not constitute publication because the information was given the prosecutor in his capacity as a public official. Further, the prosecutor's access to information about possible criminal conduct must not be so foreclosed. That "Hogue's personnel file is replete with wrongdoing," however, may be a sufficient publication if the defendants made that file available to prospective employers. See Bailey v. Kirk, 777 F.2d 567, 580 n. 18 (10th Cir.1985) and cases cited therein
 
 
 [8]
 Although the panel in Wellner v. Minnesota State Junior College Board, 487 F.2d 153 (8th Cir.1973) awarded the plaintiff back pay until he was afforded a proper name clearing hearing, we decline to follow Wellner as it was decided prior to the Supreme Court decision in Carey v. Piphus, 435 U.S. at 266, 98 S.Ct. at 1053, requiring proof of actual injury for an award of actual damages
 
 
 [9]
 Hogue contends in his brief that because the Arkansas Supreme Court has indicated that when presented with an appropriate case, it will reexamine the "at will" doctrine, Gaulden v. Emerson Electric Co., 284 Ark. 149, 153, 680 S.W.2d 92, 94 (1984), appellants' reliance on that doctrine is misplaced. We are constrained, however, to apply Arkansas law as it exists without attempting to predict the evolution of that law. Further, the Arkansas Supreme Court's reference to reexamination of the "at will" doctrine was with employment contracts requiring good cause for discharge. Id
 
 
 [10]
 We find the contrast drawn by Chief Judge Lay in his dissent, infra n. 4, between the termination review provisions at issue in Cato and the Grievance Policies and Procedures in this case to be a distinction without a difference. No significant difference exists between review procedures that are always available to a particular terminated employee, as in Cato, and similar procedures available to an employee "who feels he/she has been terminated unfairly," as here. Presumably an employee initiates review procedures when the employee feels he or she has been terminated unfairly. That an employee can expect review upon termination does not in itself create a legitimate expectancy of continued employment
 
 
 [1]
 See Gaulden v. Emerson Electric Co., 284 Ark. 149, 680 S.W.2d 92 (1984); Jackson v. Kinark Corp., 282 Ark. 548, 669 S.W.2d 898 (1984); Griffin v. Erickson, 277 Ark. 433, 642 S.W.2d 308 (1982)
 
 
 [2]
 The court did not reach the issue in Gaulden, despite the plaintiff's allegation that he had ceased to be an at-will employee upon completion of a probationary period and could be discharged only for cause. The court instead concluded that even if the employee was protected from arbitrary discharge, his employer had good cause to fire him. See Gaulden, 284 Ark. at 152, 680 S.W.2d at 94. The court also did not reach the issue in Griffin. Again the court decided that the employer's action was justified under a "good cause" standard. Griffin, 277 Ark. at 439-42, 642 S.W.2d at 311-13
 
 
 [3]
 See Hatfield v. Bishop Clarkson Memorial Hospital, 701 F.2d 1266, 1269-73 (8th Cir.1983) (Lay, C.J., dissenting)
 
 
 [4]
 This construction of the grievance procedure is not inconsistent with Cato v. Collins, 539 F.2d 656, 660-61 (8th Cir.1976). The right to hearing provisions in the teacher employment law challenged in that case, triggered when a teacher is not renewed by the school board, nowhere mention perceived unfairness as a predicate to the teacher's use of the procedures. Thus, those procedures, in contrast to the grievance procedure at issue here, did not imply that the hearing process was intended to encompass review of the substantive reasons for a teacher's termination. See Cato, 539 F.2d at 660-61 n. 6 (setting forth hearing requirements)
 
 
 [5]
 The majority fails to give deference to the district court's determination of what state law would be. This violates our long standing rule that special weight should be given to the district judge's construction of state law
 
 
 [6]
 We recognized the applicability of the Carey damage rules to discharge cases in Bishop v. Tice, 622 F.2d 349 (8th Cir.1980), an employment case alleging a deprivation of liberty. See, Bishop, 622 F.2d at 357-58 n. 17
 
 
 [7]
 In Okeson v. Tolley School District No. 25, 760 F.2d 864 (8th Cir.1985), a panel of this court, of which I was a member, did apply the Carey damage rules in an employment property interest case. See id. at 869. Although Okeson was decided one month after Loudermill, we did not cite or rely on Loudermill in reaching our decision. Had the Loudermill case been argued to us I believe our panel would have decided this issue differently in Okeson
 
 
 [8]
 The Court in Loudermill recognized that in some settings, post-deprivation hearings will satisfy due process, citing Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) and North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908). Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 1493 n. 7, 84 L.Ed.2d 494 (1985). The cases cited by the Court in no way undermine the absolute application of the Loudermill rule to employment discharge cases. Ewing and North American Cold Storage dealt with the constitutionality of legislation permitting immediate seizure of consumer products believed to be misbranded or dangerous to the public health
 
 
 [9]
 In contrast, the immediate suspension of a student, without predeprivation notice and hearing, does not violate due process when the student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process." Goss v. Lopez, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975). This distinction again highlights the disparate constitutional interests at stake in school and employment contexts
 
 
 [10]
 The ills of this shortcoming are amply set forth in Loudermill and need no repetition here. See Loudermill, 105 S.Ct. at 1494