Marvin M. WEINSTEIN,
Plaintiff-Appellant,

v.

UNIVERSITY OF ILLINOIS, et al.,
Defendants-Appellees.

No. 86–1426.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1986.

Decided Feb. 4, 1987.

As Amended March 11, 1987.

Edward H. Salomon, Chicago, Ill., for plaintiff-appellant.

Carla J. Rozycki, Keck, Mahin & Cate, Chicago, Ill., for defendants-appellees.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Many disputes may be compromised by converting the stakes to a common denominator such as money and splitting the difference. Few commercial disputes end up in court, because the disputants may readily compromise and move on. Other disputes are harder to resolve because they seem to involve principles for which no compromise is readily apparent. The result may be a private war. A dispute that would be resolved quickly in the commercial world may fester. We have such a dispute. It is about the order in which the names of an article's authors will be listed. The article is D.J. Belsheim, R.A. Hutchinson & M.M. Weinstein, *The Design and Evaluation of a Clinical Clerkship for Hospital Pharmacists*, 50 Am. J. Pharmaceutical Education 139–45 (1986). Weinstein believes that it should have been published as M.M. Weinstein, D.J. Belsheim & R.A. Hutchinson, *Etc.* According to Weinstein, the publication of the article with the names in the wrong order violated the due process clause of the fourteenth amendment.

I

Weinstein was an Assistant Professor of Pharmacy Administration in the College of Pharmacy of the University of Illinois at Chicago. According to his complaint, from which we take these facts, he proposed a clinical program for practicing pharmacists, who would operate for two weeks in a "clerkship" under the guidance of professors. Several efforts to obtain funding for such a program were unsuccessful. The University finally supplied funds from its own budget for a program in August 1983. The proposal to the University was made jointly by Weinstein, Belsheim (another assistant professor and Director of Continuing Education in the College of Pharmacy), and Hutchinson (Director of Pharmacy Practice at the University of Illinois Hospital, where the clerkship program would be carried out). All three participated in the program. Although Weinstein asserts that he supplied most of the ideas and did most of the work, he concedes that the three agreed to write jointly on the results. Weinstein believes that he had an agreement with Belsheim under which Weinstein would be the first-listed author of a paper describing the clerkship and the data obtained from questionnaires, while Belsheim would be lead author of a paper to be called "Teaching Problem Solving in a Post-Graduate Clinical Pharmacy Clerkship."

In January 1984 Weinstein gave Belsheim a draft. Belsheim was dissatisfied. The two disagreed about the subjects to be covered and the conclusions to be drawn. By January 1985 Weinstein had completed another draft. One day he found the draft in Belsheim's wastebasket, with many editorial marks and sections snipped out. Belsheim denied doing more than making "notes" but shortly produced a new draft, revising both the text and the order of listing of authors. Weinstein did not like either the new order or the new text. Belsheim raised the matter with T. Donald Rucker, head of the Department of Pharmacy Administration in the College of Pharmacy. Rucker urged "that a ruling be sought from a representative group of peers, the College Executive Committee." Neither Belsheim nor Rucker asked the committee to act. Henri R. Manasse, Dean of the College, also offered some advice to Weinstein. He suggested further consultation among the authors but expressed impatience with their slow progress. He explained: "The work described in the present draft is a clear articulation of the

accomplishments of this most important College endeavor and its results should be shared with our colleagues.... It should therefore be submitted for publication with all due haste." Three days later, on July 19, 1985, Belsheim submitted the article to the American Journal of Pharmaceutical Education. It was published in the Journal's Summer 1986 issue. Weinstein has sued Belsheim, Hutchinson, Manasse, Rucker, two other members of the faculty, the Trustees of the University, and the University itself, contending that they mutilated his work and stole the credit, denying him due process of law. He seeks a remedy under 42 U.S.C. § 1983. The district court dismissed the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted, concluding that the University owns the article and may do with it what it likes. 628 F.Supp. 862.

Weinstein says that the listing of names is no small matter. He is seeking a topic on which to write a dissertation and believes that the clerkship program would have been suitable, but that Belsheim's being listed as first author precludes it. (The record does not contain an affidavit or other evidence confirming that his thesis adviser would take this view, and if things are as Weinstein portrays them it is hard to see why the adviser would, but given the procedural posture of the case we must accept Weinstein's allegations.) He also believes that because the principal author is listed first,[1] the appearance of his name in third place will diminish his accomplishments in the eyes of other professors—a significant problem because, as we discuss below, he is looking for a job. His attorney adds the point that academic departments sometimes use the number of citations to a scholar's work as one indication of the importance of that work in the profession. The principal citation services list articles by first author only, so that any citations to the Belsheim, Hutchinson & Weinstein article would be collected under Belsheim's name.[2]

We shall assume, given the posture of the case, that Weinstein could make good his claims of injury-in-fact. We shall also assume that the acts of Belsheim, an employee of a state university, were taken "under color of state law", see *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982), and that the letter of the Dean of the College of Pharmacy is the sort of decision that may be imputed to the University under *Pembaur v. City of Cincinnati*, —— U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). None of these assumptions assists Weinstein unless the acts to which he objects have deprived him of "property", for the due process clause applies only to deprivations of "life, liberty or property", and Weinstein does not invoke the first two.

## II

The district court concluded that the article was the University's property rather than Weinstein's because it was a "work for hire". The copyright law gives an em-

---

1. We assume that the custom in Weinstein's profession is as he describes it. This is not universal. All three members of this panel have followed the custom in the legal profession of listing authors in alphabetical order. E.g., R.D. Cudahy & J.R. Malko, *Electric Peak-Load Pricing: Madison Gas and Beyond*, 1976 Wisc.L.Rev. 47; F.H. Easterbrook & D.R. Fischel, *Corporate Control Transactions*, 91 Yale L.J. 698 (1982); W.M. Landes & R.A. Posner, *The Positive Economic Theory of Tort Law*, 15 Ga.L.Rev. 851 (1981). The listing "Belsheim, Hutchinson & Weinstein" is alphabetical. Of course, the practice in the legal profession is subject to exceptions. See, e.g., the listing of members of this panel at the beginning of the opinion, or the listing on any brief.

2. There will not necessarily be citations to it. Weinstein has published 13 articles other than the one in question. According to the *Social Science Citation Index* and the *Science Citation Index*, only two have been cited (once each) since 1969. If neither *Index* should report a citation to this article, the order in which the authors are listed would be academic. Even if there should be a citation, other professors know the *Indexes*' practice of collecting citations under the name of the first author, so with a list of Weinstein's articles they would know under what names to look; still, this is a pain, and perhaps putative employers would not bother.

ployer the full rights in an employee's "work for hire", 17 U.S.C. § 201(b), unless a contract provides otherwise. The statute is general enough to make every academic article a "work for hire" and therefore vest exclusive control in universities rather than scholars. See DuBoff, *An Academic's Copyright: Publish and Perish*, 32 J. Copyright Society 17 (1984). The University of Illinois, like many other academic institutions, responded to the 1978 revision of the copyright laws by adopting a policy defining "work for hire" for purposes of its employees, including its professors. According to the policy, which is a part of each professor's contract with the University, a professor retains the copyright unless the work falls into one of three categories:

(1) The terms of a University agreement with an external party require the University to hold or transfer ownership in the copyrightable work, or

(2) Works expressly commissioned in writing by the University, or

(3) Works created as a specific requirement of employment or as an assigned University duty. Such requirements or duties may be contained in a job description or an employment agreement which designates the content of the employee's University work. If such requirements or duties are not so specified, such works will be those for which the topic or content is determined by the author's employment duties and/or which are prepared at the University's instance and expense, that is, when the University is the motivating factor in the preparation of the work.

The district court held that Weinstein's work is covered by paragraph (3) because the University funded the clerkship program and because, as a clinical professor, Weinstein was required to conduct and write about clinical programs.

■ This interpretation of the University's policy collides with the role of the three categories as exceptions to a rule that faculty members own the copyrights in their academic work. A university "requires" all of its scholars to write. Its demands—especially the demands of departments deciding whether to award tenure—will be "the motivating factor in the preparation of" many a scholarly work. When Dean Manasse told Weinstein to publish or perish, he was not simultaneously claiming for the University a copyright on the ground that the work had become a "requirement or duty" within the meaning of paragraph (3). The University concedes in this court that a professor of mathematics who proves a new theorem in the course of his employment will own the copyright to his article containing that proof. This has been the academic tradition since copyright law began, see M. Nimmer, *Copyright* § 5.03[B][1][b] (1978 ed.), a tradition the University's policy purports to retain. The tradition covers scholarly articles and other intellectual property. When Saul Bellow, a professor at the University of Chicago, writes a novel, he may keep the royalties.

The University's copyright policy reads more naturally when applied to administrative duties. Perhaps the University forms a committee to study the appropriate use of small computers and conscripts professors as members. The committee may publish a report, in which the University will claim copyright. We do not say that a broader reading is impossible, but such a reading should be established by evidence about the deliberations underlying the policy and the course of practice—material that is neither in the record nor an appropriate basis on which to dismiss the complaint for failure to state a claim. We would be surprised if any member of the faculty of the College of Pharmacy treats his academic work as the property of the University. Dean Manasse, for example, has not submitted an affidavit stating that the faculty regularly obtains consent (or a transfer of copyright) from the University before publishing articles. The record does not contain the contracts between the American Journal of Pharmaceutical Education and Professors Belsheim, Hutchinson, and Weinstein, but we venture a guess that each represented

to the Journal that he owned the copyright and was empowered to transfer the copyright to the Journal. (The article as published carries the Journal's copyright notice rather than that of the authors or the University of Illinois.) Dean Manasse told Weinstein to *publish* the article, not to ask the University for permission to publish—permission that would have been essential if the University owned the copyright.

■ If the members of the University's faculty own the copyright interest in their scholarly articles, Weinstein has some "property". But did the University "deprive" him of this property without "due process"? Both "deprivation" and "due process" are problematic. If the University does not own the copyright, the article is covered by 17 U.S.C. § 201(a), which states that "[t]he authors of a joint work are coowners of copyright in the work." This provision applies to all works of joint authorship, and Weinstein concedes that the article in question is (and was supposed to be) a jointly written work. See also *Latman's Copyright Law* 115–17 (W. Patry 6th ed. 1986). Each coowner of a copyright may revise the work (that is, make a derivative work) and publish the original or the revision. See *Oddo v. Ries,* 743 F.2d 630, 633 (9th Cir.1984) (collecting cases); *Latman's Copyright Law* at 116–17; Nimmer § 6.03 at 6–9. So far as copyright law is concerned, Belsheim was entitled to do what he did.[3] Belsheim is answerable to Weinstein for Weinstein's share of any royalties, but Weinstein does not claim that

Belsheim made off with the profits. Belsheim did not diminish any of Weinstein's property rights; neither did the University. The University did not make Belsheim's acts possible. It therefore did not "deprive" Weinstein of any property interest. Indeed it could not have done so. No amount of academic deliberation or hearings before the College Executive Committee could have diminished Belsheim's entitlement to revise the article. Perhaps the University could have threatened Belsheim with sanctions, such as a duty to teach boring subjects, to induce him to desist, but the due process clause does not require a state to impose penalties on those who exercise legal entitlements.

■ Perhaps Weinstein, Belsheim, and the University could have agreed by contract to give the University the power to make binding decisions concerning disputes over academic papers, but Weinstein does not identify any such agreement. The University therefore had no more power over this manuscript than it did over the title to Belsheim's car or Weinstein's family heirlooms. The potential use of contracts does identify the essence of this dispute, however. It is really a contract dispute between Belsheim and Weinstein about their contributions to the article. Authors may make contracts as they please about their endeavors. These derive their force from private agreement, and disputes about them arise under state law rather than copyright law. See *Oddo* and Judge

---

**3.** Weinstein tries to avoid this by asserting *droit moral,* the Continental principle that an author may prevent mutilation or misuse of his work. Copyright persists in "derivative works", see 17 U.S.C. § 103, which gives authors control over changes and republications along the lines of *droit moral,* see *WGN Continental Broadcasting Co. v. United Video, Inc.,* 693 F.2d 622, 625 (7th Cir.1982); *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14 (2d Cir.1976), but copyright does not prevent alterations by coauthors. So Weinstein must be claiming additional rights against Belsheim and the University by virtue of state law. "Property" is defined for purposes of the due process clause by principles of state law, see *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976), and Weinstein does not contend that Illinois (or any other

jurisdiction in the United States) recognizes *droit moral* as a general principle. Three states have enacted statutes extending rights similar to *droit moral* to works of art. See *Latman's Copyright Law* at 88; E.W. Kitch & H.S. Perlman, *Legal Regulation of the Competitive Process* 731 (3d ed. 1984). But no jurisdiction has created the sort of moral right Weinstein invokes, let alone created any moral right through judicial decision. A federal court is not about to foist so novel a principle on Illinois. There is no reason to suspect that the courts of Illinois are just about to adopt an approach that no American jurisdiction follows as a general matter. Cf. *Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 942 (7th Cir.1986); *Shaw v. Republic Drill Corp.,* 810 F.2d 149 (7th Cir.1987).

Friendly's justly famous opinion in *T.B. Harms Co. v. Eliscu,* 339 F.2d 823 (2d Cir.1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). See also Lea Brilmayer, *An Introduction to Jurisdiction in the American Federal System* 51–52 (1986). Cf. *Merrell Dow Pharmaceuticals Inc. v. Thompson,* — U.S. —, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

The courts of Illinois are open to Weinstein if he claims that the state "deprived" him of any rights established by contract with Belsheim. Contractual rights are a kind of property. See *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1982). We may assume that the due process clause applies to efforts by the state to eliminate entitlements established by private contracts. Yet if Dean Manasse's letter somehow forced Weinstein to surrender his entitlements or induced Belsheim to break a promise to Weinstein, the "due process" of which the fourteenth amendment speaks is a suit under state law. See *Hudson v. Palmer,* 468 U.S. 517, 530–36, 104 S.Ct. 3194, 3202–05, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Ingraham v. Wright,* 430 U.S. 651, 674–82, 97 S.Ct. 1401, 1414–18, 51 L.Ed.2d 711 (1977); *Gumz v. Morrissette,* 772 F.2d 1395, 1403–04 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986). Weinstein does not attack the adequacy of the process offered by the courts of Illinois or even of the process he thinks the University should have used—a reference of the dispute to the College Executive Committee. To the extent he complains about the University's deviation from ordinary procedures, he complains about an unauthorized or random act; the courts afford due process for such cases. More generally, however, courts offer all the process that is "due" for resolving disputes about contracts and inducements to break them. It is unnecessary for a state to provide inside each agency or university a little system of courts to resolve disputes among employees; a system of courts with general jurisdiction is enough. It would be astonishing if the customary judicial process—often held out as the model of due process to which administrative adjudication should aspire—were itself unconstitutional. Weinstein does not say that his dispute with Belsheim presented a life-or-death question requiring a departure from the norm that a subsequent hearing is sufficient. See *Mathews v. Eldridge,* 424 U.S. 319, 333–35, 340–43, 96 S.Ct. 893, 902–03, 905–07, 47 L.Ed.2d 18 (1976). No one at the University acted without listening to Weinstein's complaints; this satisfied any requirement that some sort of consideration and opportunity to make one's position known precede state action. As for the rest, the University is entitled to leave to the courts questions of contract. The district court relinquished jurisdiction over Weinstein's pendent claims under state law; the courts of Illinois are open to him still.

### III

If war is the extension of diplomacy by other means, this suit—like other litigation a form of warfare—is the extension of academic politics by other means. Weinstein and Belsheim were unable to compromise, and Weinstein has dragged his fellow scholars and the University into the contest. His willingness, even eagerness, to sue his colleagues may be explained by the fact that the University has fired him.

Weinstein was an instructor from 1968 until 1980, when he was hired as an assistant professor, his first tenure-track position. Professors on the tenure track at the University of Illinois have contracts specifying that the professor has no expectation of renewal. From time to time the faculty evaluates the candidate, with the expectation that by the end of six years the candidate will be given tenure or be released. Weinstein's first formal evaluation, in 1983, was negative. He had not published anything in a refereed journal in three years and was told to shape up. He did not publish anything new by the spring of 1984, when the second review occurred. This review was negative too. Department head Rucker, who made the critical recom-

mendation, wrote to Weinstein that his teaching and citizenship were adequate but that "In reviewing your role in research and scholarly activity ... I find major weaknesses. Since September of 1980, you have not published a single article in a refereed journal. Moreover, your dossier list [sic] (with an incorrect citation) a 'Letter to the Editor' with the implication that it represented a contributed article when it did not. In addition, I see no evidence that any such manuscripts were even submitted for the purpose of publication." The University gave Weinstein a terminal contract, expiring August 31, 1985. So by the time Dean Manasse told Weinstein to get a move on in publishing the article, Weinstein had already "perished" at the University of Illinois for lack of publication and was six weeks away from being unemployed.

 Weinstein insists that his discharge violates the Constitution, which is absurd. He lacked a property interest in his position.[4] No set of facts entitled him to reappointment. *McElearney v. University of Illinois,* 612 F.2d 285, 289–91 (7th Cir.1979), holds that an untenured professor at the same university, employed under the same contract, lacked a property interest. See also *Grimes v. Eastern Illinois*

*University,* 710 F.2d 386, 387 (7th Cir.1983) (reaffirming *McElearney* ). Weinstein does not so much distinguish *McElearney* as deny its existence. His brief cites *McElearney* for the first time at page 48, asserting that the case does not apply because McElearney received some kind of hearing while he did not. But the holding of *McElearney* is that an untenured professor at the University of Illinois has no property interest, so that the due process clause does not apply. The Supreme Court has rejected Weinstein's claim that a proffer of procedure can establish a property interest in the absence of substantive rules of entitlement, see *Olim v. Wakinekona,* 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983); *Board of Curators v. Horowitz,* 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 956 n. 8, 55 L.Ed.2d 124 (1978); and this court's cases offer many similar holdings, e.g., *Shango v. Jurich,* 681 F.2d 1091, 1101 (7th Cir.1982); *Huggins v. Isenbarger,* 798 F.2d 203, 206 (7th Cir.1986). "Grievance procedures that do not establish any grounds upon which termination may be based do not themselves create a property interest in employment." *Hogue v. Clinton,* 791 F.2d 1318, 1324 (8th Cir. 1986).[5] See also, e.g., *Navas v. Gonzalez*

---

**4.** He makes a first amendment argument in passing, but he was not fired on account of the political slant of his views. He was fired for not having any views, at least none recently in print. A public university is entitled to insist that its faculty conform to the same standards of scholarly productivity and quality that private universities use. That includes publishing useful work, even though the first amendment extends to the public at large a "right to keep silent" as a corollary of the right to decide what to say. *Wooley v. Maynard,* 430 U.S. 705, 714–15, 97 S.Ct. 1428, 1435–36, 51 L.Ed.2d 752 (1977). Weinstein invokes "academic freedom", but that equivocal term, see *Piarowski v. Illinois Community College District 515,* 759 F.2d 625, 629 (7th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985), does not help him. Judicial interference with a university's selection and retention of its faculty would be an interference with academic freedom. We need not cogitate hard cases—such as denials of tenure because of objections to the politics underlying scholarly work—to know that a denial of tenure on account of having no scholarly work does not offend any provision of the Constitution.

**5.** The status of *Hogue* is unclear, in light of the efforts by a divided panel of the Eighth Circuit to confine that decision. See *Skeets v. Johnson,* 805 F.2d 767 (8th Cir.1986). The majority concluded that an untenured employee has a "property" interest in receiving the grievance procedures established by state law, when the agency purports to act for cause. It distinguished *Hogue* on the ground that the employee there had received "some kind of hearing", while the employee in *Skeets* had been fired summarily. It stated, *id.* at 772: "We are well aware that our holding seems to narrow some of the language in *Hogue,* but we cannot believe that *Hogue* is a signal for us to countenance the complete deprivation of even the rudiments of due process as occurred in this case. The grievance procedures in this case create a reasonable expectation that a grievance will be handled fairly." In other words, the procedures established by state law supplied a property interest even though no rule of decision created a substantive entitlement to remain an employee under any circumstances. Judge Bowman, in dissent, pointed out that the majority had not discussed any of the governing decisions of the Supreme Court, in-

*Vales,* 752 F.2d 765, 768 (1st Cir.1985); *Eguia v. Tompkins,* 756 F.2d 1130, 1137–38 (5th Cir.1985); *Levitt v. University of Texas,* 759 F.2d 1224, 1231–32 (5th Cir. 1985). See also *Snowden v. Hughes,* 321 U.S. 1, 11–13, 64 S.Ct. 397, 402–03, 88 L.Ed. 497 (1944) (an argument that a failure to follow procedures established by state law thereby violates the Constitution is so insubstantial that it does not establish federal jurisdiction). Weinstein ignored all of these cases. The rule of law is clear enough that even a wilfully blind litigant cannot misunderstand.

■ Weinstein is litigating a defunct claim. He hasn't a chance; he never did; but he has put the University to some expense. This is frivolous litigation. Fed. R.App.P. 38 allows us to award attorneys' fees to parties who resist frivolous claims on appeal. For a sample of our more recent cases, see *Reis v. Morrison,* 807 F.2d 112 (7th Cir.1986); *Dreis & Krump Mfg. Co. v. Machinists,* 802 F.2d 247, 255–56 (7th Cir.1986); *Spiegel v. Continental Illinois National Bank,* 790 F.2d 638, 650–51 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986). The claim that the due process clause prevents Weinstein's discharge was so tenuous that an award of fees would have been appropriate in the district court. Once the district court forcefully drew Weinstein's attention to *McElearney,* further litigation was a waste of everyone's time. See also *District No. 8 of Machinists v. Clearing,* 807 F.2d 618, 622–23 (7th Cir.1986). The University won *McElearney* once; it need not keep litigating and winning *McElearney* over and again.

Awards of attorneys' fees induce people to reconsider and ensure that refusals to surrender do not burden the innocent. See *Coleman v. CIR,* 791 F.2d 68, 72 (7th Cir. 1986). They also protect the courts–and derivatively parties in other cases–from impositions on their time. The more time we must devote to sifting through the claims of people who neglected to do their own legal research, the less time is available to deal with the claims of litigants who have substantial, unresolved questions. It is therefore not dispositive that the University did not ask for attorneys' fees in this case. The court has an interest in the orderly conduct of business, an interest independent of the University's. Recent cases including *Reis, Clearing,* and *Dreis & Krump* award fees in the absence of requests, and an award is similarly appropriate here. The defendants are entitled to attorneys' fees for the time necessary to reply to Weinstein's attack in this court on his discharge. They have 15 days to file an appropriate statement with the clerk of this court.

AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part.

I agree that Weinstein must lose in all branches of his case, although I believe that the majority inaccurately diminishes Weinstein's complaint by saying that it involves only the order of authors' names. Maj. op. at 1092. Weinstein also alleges that the procedure employed by the university to evaluate him for a tenured position denied him due process, that the publication of his article in a revised form denied him his property interest in the writing without due process and that the university violated his first amendment rights.

cluding *Olim* and *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 874, 871, 74 L.Ed.2d 675 (1983), which hold that procedural protections are not themselves "property". See 805 F.2d at 776–81. The majority's statement that the state had deprived the employee of the "rudiments of due process" begged the question, which was whether the due process clause applied. If it does not, the state need not supply a hearing of any sort. *Olim* and *Hewitt* expressly reject the majority's arguments in *Skeets,* as do several of our cases—including *Shango v. Jurich,* on which Judge Bowman relied at length, 805 F.2d at 780–81, but which the majority did not discuss. The position taken by Judge Bowman, rather than that of the majority in *Skeets,* therefore represents the established law of this circuit. We could not follow the majority without disregarding authoritative decisions of the Supreme Court and this court.

Although Weinstein does not win on any of these claims, his suit is not as meritless as the majority's brief description of the dispute implies.

With respect to the literary property claim, I am less inclined than the majority to concede the existence of state action. As the majority points out, this is essentially a contract controversy between two professors. The involvement of the state in this private dispute can be described as peripheral at best. If the state did not deprive Weinstein of his property interest, we need not discuss the relative virtues of pre- and post-deprivation remedies.

In any event, I cannot join in the portion of the majority opinion that awards attorney's fees on appeal with respect to the discharge claim. The university did not request fees and I have serious doubts whether, in the ordinary case and absent egregious circumstances, we should reach out to make fee awards based only on our own assessment of lack of merit. This is bound to be a capricious business, punishing some while far worse offenders go unsanctioned.[1] And it may have an undue chilling effect on litigation—good and bad alike. More important, as in other *sua sponte* dispositions, litigants have no opportunity to speak in their own defense. The defects in the discharge allegation here suggest a serious misreading of the elements of a due process claim rather than bad faith of any kind.

Of course, the courts have a strong interest—quite apart from that of the litigants—in discouraging frivolous litigation. It is also arguable that the discharge claim here is sufficiently meritless to at least border on the frivolous. But the university may have reasons of its own not to request fees and quite possibly those reasons outweigh in this case the public interest in discouraging poorly supported lawsuits.

I therefore respectfully dissent from the award of fees.

1. It might be fairer just to adopt the English rule and say, "If you lose, you pay."