**ULTRALITE CONTAINER CORPORATION and Stoughton Composites, LLC, Plaintiffs–Appellees, Cross–Appellants,**

v.

**AMERICAN PRESIDENT LINES, LIMITED, Defendant–Appellant, Cross–Appellee.**

Nos. 98–2214, 98–2371, 98–2769 and 98–2782.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1999.

Decided March 22, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied April 16, 1999.

Jonathan H. Margolies (argued), Michael, Best & Friedrich, Milwaukee, WI, for Plaintiffs–Appellees, Cross–Appellants in Nos. 98–2214, 98–2769 and 98–2782.

James E. Hammis, Stoughton Trailers Incorporated, Stoughton, WI, for Ultralite Container Corporation in No. 98–2371.

Jonathan H. Margolies (argued), Michael, Best & Friedrich, Madison, WI, for Stoughton Composites, LLC in No. 98–2371.

Donald K. Schott (argued), Quarles & Brady, Madison, WI, for Defendant–Appellant, Cross–Appellee.

Before FLAUM, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

American President Lines (APL) and Stoughton Composites formed a joint venture, Ultralite Container, to manufacture shipping containers. The containers were to be made of composites (combinations of resin and fiberglass), with thin walls, meeting International Standards Organization requirements for intermodal shipping. ("Intermodal" containers can be hauled by ship, rail, or truck, and commonly use a combination of these to reach their destination.) A composite intermodal shipping container would be lighter than the standard ISO container—especially if built with very thin walls—and the parties anticipated that it would require less maintenance. APL contributed to the joint venture its knowledge of shipping requirements, plus about $3.8 million; Stoughton contributed its expertise in the design and manufacture of composite containers, plus its manufacturing facilities. Stoughton was to design and manufacture the containers. APL undertook to purchase 3,000 dry or 2,000 refrigerated containers; if it failed to meet this commitment, it was to forfeit its interest in the joint venture and pay Stoughton $600,-000. APL also negotiated a side agreement with Transamerica Leasing to take 1,000 of these containers.

APL later decided that a dry container made from composites would be too expensive; that aspect of the project was aban-

doned. When Ultralite finished its first refrigerated containers in 1995, APL was not happy. It asserted that the containers were prone to "delamination" (that is, separation of the foam insulation from the wall). By the time APL registered this protest, Ultralite had made 127 refrigerated containers. APL and Stoughton renegotiated their agreement to provide that APL would pay $1,076,766.40 for 62 of these containers and Transamerica would take the rest; Stoughton surrendered its right to the $600,000 as a termination fee. Ultralite delivered 62 containers to APL, which despite this agreement sent them back as defective and refused to pay. But a jury in this litigation under the diversity jurisdiction concluded that the containers were not defective and ordered APL to pay the whole purchase price. Acting on APL's counterclaim, the district judge enjoined Stoughton from making for the trucking industry any container with a wall less than 0.09 inches thick. The judge thought that the know-how to produce thin walls came in part from work Stoughton performed on the Ultralite project. Stoughton represents (without contradiction from APL) that this injunction has essentially put it out of business, because it needs to make thin-walled trailers in order to compete. Both sides have appealed.

■■■ APL sought to persuade the jury that delamination made the containers unmerchantable; Stoughton and Ultralite (by then firmly in Stoughton's camp, for APL had forfeited its ownership interest by failing to buy 2,000 containers) responded that the real explanation for APL's change of course was a decline in the price of intermodal containers available from other sources. The jury sided with Stoughton and had an ample basis for doing so. Transamerica paid for its 65 containers and never complained about their quality; the jury could find that the 62 containers delivered to APL likewise conformed to the contract. But by awarding damages in the amount of the purchase price, the jury implied that it thought the containers worthless (as APL contended)—for the usual damages formula in a case such as this is the purchase price less the market price of the goods at the time of repudiation. Uniform Commercial Code § 2–708(1). (California law governs this issue, and California had enacted Article 2 of the UCC. Section 2–708(1) is California Commercial Code § 2708(1). Other citations are easy to construct, so we cite the official text of the UCC for simplicity.) If the market value of the containers is $0, as the jury's award implies, then the containers are not merchantable and APL should have prevailed. Yet although the verdict appears to be self-contradictory, neither side asked the judge to send the jury back for further deliberations. Instead APL filed post-judgment motions seeking a new trial (on the ground that the jury must have misunderstood the instructions) or outright victory (on the ground that the jury must have determined that the containers were worthless). The district judge agreed with APL that something went wrong but thought that the verdict could be fixed up by awarding APL ownership of the 62 containers. That way, the judge reasoned, APL could obtain for itself (by using or selling the containers) whatever market value they have, just as if the jury had subtracted their value.

That's not a good fix. After amendment by the district court, the judgment gives Ultralite the one remedy it can't have under the UCC: specific performance. The seller gets the contract price, and the buyer keeps the goods. Specific performance transfers to the buyer the seller's duty to mitigate damages. Ultralite is happy to be rid of the containers; it has not asked for modification of the order to hand them over to APL, and though it concedes that specific performance is improper in litigation under Article 2 of the UCC it nonetheless asks us to affirm, relying on § 2–709. This provision permits a seller to recover the price of goods that have been identified to the contract (as these 62 containers were) "if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." UCC § 2–709(1)(b).

Rob Sjostedt, Stoughton's president, testified that he tried to sell APL's 62 containers to Transamerica, which refused to purchase more than the agreed 65 units in light of APL's unhappiness with the product. Sjostedt offered the containers for $14,500 apiece (well under the contract price of $17,367) to

some potential buyers but did not close any sales. He listed the containers on Stoughton's web site but did not attract a customer. APL contends that these efforts were not "reasonable" because the world market price for seagoing refrigerated containers had fallen to $13,800 by the time Stoughton quoted $14,500, but the jury was not bound to accept this, for the price available from other vendors was disputed. Moreover, the jury had some reason to conclude that APL itself spoiled the market. It badmouthed the containers to other participants in the business (which is why Transamerica would not take more), and as APL was one of the joint venturers its vocal disavowal of Ultralite's products was bound to make sales difficult. By effectively pulling the plug from the joint venture, APL orphaned Ultralite's containers. There were unlikely to be more of the same kind, and many shipping companies are reluctant to buy products on which they cannot standardize (and for which they may have difficulty obtaining replacement parts). Perhaps Sjostedt could have overcome customers' reluctance by conducting a fire sale, quoting prices of $10,000 or even $5,000, but then APL surely would be insisting that the terms of sale were not commercially reasonable, and that it was entitled to a greater credit under § 2–708(1). A jury sensibly could have concluded not only that Sjostedt attempted to sell the containers "at a reasonable price" but also that APL's public rejection of the containers reasonably implied that additional efforts to move the goods would have been unavailing. Thus the jury was entitled to award the full contract price under § 2–709(1)(b). The verdict was not self-contradictory, no fix was necessary, and APL has not been harmed by the order requiring Ultralite to let APL haul the containers away.

■ Although the parties have locked horns on many additional issues, the cornerstone to all of them is two confidentiality agreements that the parties signed. The district judge concluded that before setting to work on the Ultralite project, Stoughton could not make a composite trailer with walls less than 0.09 inches thick; by 1997, however, Stoughton was offering composite trailers with 0.065 inch walls. Engineers who worked on intermodal containers for Ultral-

ite also worked on over-the-road containers for Stoughton, which conceded that it could not prove that *none* of the information and skills used to make the trailers could be traced to the Ultralite project. Using even a smidgen of information would violate the commitment not to use any information deemed proprietary under the parties' agreements, the court held. Concluding that it is impossible to trace all of the intellectual property to its source, the judge ordered Stoughton to refrain from making walls thinner than 0.09 inches until July 2003, even if the technology to do so were developed independently (or purchased from a third party) after Ultralite fizzled. The final judgment also requires Stoughton to pay APL $1,150 for each refrigerated trailer unit Stoughton manufactured after April 16, 1998, as an estimate of its profit. (The $1,150 is 8% of the trailer's selling price, and the parties agreed that 8% is the normal gross margin in the industry.) None of the many issues the parties raise about the injunction, the use of profits as an estimate of the reasonable royalty for use of the information, the absence of an accounting, the attribution of the entire profit to the information Stoughton derived from the Ultralite endeavor, and the effect (if any) of a license Ultralite ultimately gave Stoughton to use its information, matters in the end, for we conclude that the district judge erred at the first step: information Stoughton developed is not the sort of "Proprietary Information" that it is forbidden to use.

The first confidentiality agreement, signed in May 1993, committed both APL and Stoughton "to keep in confidence, *and not use for its own commercial benefit* and prevent the disclosure … [of] all Proprietary Information designated by the disclosing party" (emphasis added). This agreement goes on to say that information is restricted only if so "designated by the disclosing party in writing or by an appropriate stamp or legend to be Proprietary Information which is received by the other pursuant to this Agreement". Information Stoughton used to make its over-the-road trailers was developed by Stoughton itself; so Stoughton was the "disclosing" rather than the "receiving" party for this information, and it did not tell itself to

keep the knowledge confidential from itself. So far, then, no contractual problems. The May 1993 agreement means that APL can't use information Stoughton discloses to it, and Stoughton can't use information APL discloses to it, not that Stoughton can't use internally-developed information in its own business.

According to APL, everything changed in 1995, when the parties signed a second agreement containing confidentiality provisions. This provides in part that information

> generated or otherwise produced in connection with the design, research, development and testing of the Prototype Refrigerated Containers shall (i) be considered Proprietary Information *disclosed by each of SCI [Stoughton] and APL to the other* and to Ultralite for purposes of that certain Proprietary Information Disclosure Agreement dated as of May 21, 1993, by and between APL and SCI, (ii) *remain the joint property of APL and SCI* exclusively and (iii) be considered information and technology jointly licensed by APL and SCI to Ultralite .... APL and SCI each hereby *agrees not to license* (other than to Ultralite as contemplated herein), pledge, sell *or otherwise transfer* any Proprietary Information, which is the subject to [sic] such Proprietary Information Disclosure Agreement referred to in the immediately preceding sentence, without the prior written consent of the other.

(Emphasis added.) Under the 1995 agreement any information Stoughton creates in connection with the project is treated as information disclosed by "each" party to the other, and therefore as information disclosed by APL to Stoughton. Under the 1993 agreement Stoughton may not "use for its own commercial benefit" any information disclosed to it by APL, which wants us to stop reading here. But why should we? If the information is treated as disclosed by APL to Stoughton, it is also treated as disclosed by Stoughton to APL—and there can be no doubt that Stoughton is free under the 1993 agreement to use for its own purposes the information it discloses to APL, for the 1993 agreement imposes obligations only on the "receiving party". This implies that the real restrictions on a party's use of its own infor-

mation come in the following clauses, which provide that the information is the "joint property of APL and SCI" and must not be licensed or transferred without the other's consent; this language would be pointless if "joint property" were subject to an absolute prohibition on use or disclosure. To say that it must not be licensed or transferred without consent is to imply that it *may* be used internally without the other's consent, just as Stoughton did.

■ California permits each owner of jointly-owned property to use that property in its own business. *Zaslow v. Kroenert,* 29 Cal.2d 541, 548, 176 P.2d 1 (1946); *Donlon v. Donlon,* 155 Cal.App.2d 362, 318 P.2d 189 (1957). This is also so for intellectual property when federal law supplies the rule of decision. *Seshadri v. Kasraian,* 130 F.3d 798 (7th Cir.1997); *Weinstein v. University of Illinois,* 811 F.2d 1091 (7th Cir.1987). Giving each owner a presumptive right to use property dispenses with the need for negotiations one use at a time—negotiations that may be costly (and are apt to break down) because of the bilateral monopoly that exists after the information has been created. Owners may agree in advance to restrict the use of joint property, but a contract that designates certain property as jointly owned implies a license for each party to use the information.

Stoughton did not make a secret of its desire to manufacture thin-walled composite containers for the trucking industry—this was, after all, Stoughton's primary business. In 1994 Stoughton disclosed to Ultralite's board (which then included a representative of APL) that it planned to develop over-the-road containers using technology similar to that of the Ultralite project; Ultralite's board unanimously registered its view that this would be consistent with the parties' agreement. APL now downplays this approval, noting that the board approved only the development of prototypes, not of production containers. Note that APL does *not* say that the 1995 contract vitiated the board's approval of Stoughton's plans; it would be most implausible to attribute to Stoughton an abandonment of these plans in 1995 without so much as a word in the agreement directly

addressing the issue. The distinction APL draws between prototype and production containers supposes that the parties' agreement required Stoughton to come back to Ultralite to obtain its assent (and presumably a license of intellectual property) before selling the finished containers to the trade. Yet Stoughton *did* get a license from Ultralite (though after APL had forfeited its seat on Ultralite's board)—and APL insists that this license is ineffectual because Ultralite is entitled to license use of its technology only for *intermodal* containers; permitting use of the technology in *over-the-road* containers is outside Ultralite's powers, APL insists. Well, if that is so, then why did Ultralite approve Stoughton's development plans in 1994? Was APL just leading Stoughton on? If as APL now says Ultralite can't license its intellectual property for use in over-the-road containers, it must follow that Stoughton has owned this intellectual property all along for over-the-road use—otherwise it vanishes from the face of the earth, a most implausible disposition to attribute to these parties.

"Not with our $4 million!" is APL's principal response to this line of argument. Having put up development capital, APL wants to control (or profit from) all uses of the technology. Why would it finance Stoughton's engineering for a separate business, APL asks? But things are not so simple—and not only because APL agreed by contract that the intellectual property of the joint venture was the "joint property" of APL, Ultralite, and Stoughton. Stoughton invested too, contributing its personnel and manufacturing facilities. Stoughton's total outlay exceeded APL's. Ultralite was more likely to make progress if Stoughton committed the engineers most familiar with composite technology. If the contracts mean what APL says they mean, however, by putting its staff to work on the Ultralite project even for a day Stoughton disabled everyone, perhaps forever, from working on the over-the-road part of its business. It would have had to erect a Chinese Wall to separate the knowledge, and the only practical way to do this would have been to have separate staffs for intermodal containers and over-the-road containers. That would have forfeited any economies of scope from investigating thin composite technology that has applications to different kinds of containers—in other words, it would have required Stoughton to perform the same work twice, perhaps by sending Ultralite a cadre of inexperienced engineers, so that it would not poison the well for its core business.

Sometimes partners to a joint venture agree to a Chinese Wall around the information. Such agreements are most common when the parties otherwise are competitors, for neither wants to give the other a leg up, but APL and Stoughton are not rivals. Their businesses are complementary. (APL has conceded that Stoughton's over-the-road containers do not compete with it, and that it had no lost profits.) This joint venture was designed to jump off from intellectual property Stoughton already possessed; that could not be achieved if Stoughton had to segregate the bodies of knowledge rigidly, on pain of forfeiting the opportunity to make any technical advances in its original product base. Nothing in the 1993 or 1995 agreements demonstrates that the parties were this self-destructive. A firm in APL's position might think that the no-outside-disclosure and no-competition clauses gave it quite enough protection, and that to strive for more would undercut the economies that the joint venture sought to achieve. Thus we conclude that the contracts permit Stoughton to use information from the Ultralite project in Stoughton's original business.

The judgment on the jury verdict in Stoughton's favor is affirmed. The equitable relief in APL's favor is reversed. Because Stoughton has prevailed across the board, it recovers its costs in all four appeals.